George J. CAMPBELL, Jr., Howard D. Campbell, and Helen I. Hunt, As Trustees Under the Last Will and Testament of George J. Campbell, Deceased

v.

The UNITED STATES.

No. 47–78.

United States Court of Claims.

Sept. 23, 1981.

Edward A. Morgan, New York City, atty. of record, for plaintiff. Evelyn P. Cheverie and Alexander & Green, New York City, of counsel.

Thomas M. Lawler, Washington, D. C., with whom was Acting Asst. Atty. Gen. John F. Murray, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on the joint motion of the parties, filed August 4, 1981, moving that the court adopt as the basis for its judgment in this case the recommended decision of Trial Judge John P. Wiese, filed May 20, 1981, pursuant to Rule 134(h). Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended deci-

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

** These facts substantially repeat the information found in the findings of fact which accompany the opinion. To the extent the opinion

sion, as hereinafter set forth *, it hereby grants the parties' motion and affirms and adopts the decision as the basis for its judgment in this case. Accordingly, judgment is entered for plaintiff and against defendant of $1,399,717.19, together with statutory interest thereon.

### OPINION OF TRIAL JUDGE

WIESE, Trial Judge:

In this tax refund suit, the court is called upon to determine the fair market value of restricted stocks and bonds that made up part of the consideration received by a trust (the taxpayer here) for the sale of its interest in a family-owned corporation. After consideration of all the evidence, including the appraisal reports submitted by both the taxpayer and the government, the court concludes that, as of the date of sale, the combined value of the securities received by the taxpayer was $7,266,750. A refund of $1,399,717.19 plus statutory interest thereon follows from this determination.

### FACTS **

The individual plaintiffs are the trustees of a trust created under the Last Will and Testament of their father, George Campbell. In November 1968, the trust owned approximately 49 percent of the outstanding stock of the Campbell Chain Company—a family-owned chain manufacturing business that George Campbell had started in 1920.[1]

Although Campbell Chain lacked the glamour commonly associated with a high-technology operation, it was, nonetheless, a solidly-grounded business undertaking. During the years of chief concern here, 1964–68, the company's sales grew at an averaged annual rate in excess of 10 percent, and its net income, at an averaged

relies on facts that are not dealt with in the accompanying findings, the same are to be taken as additional factual determinations by the trial court.

1. The remaining 51 percent of the stock was owned by George Campbell's children and their families.

annual rate of more than 20 percent. By 1968, Campbell Chain had become the second largest chain manufacturer in the country, with annual sales in excess of $18 million. In that year, approximately 25 percent of the company's business involved the fabrication of anti-skid tire chains; a substantial amount of its product was sold for other commercial and industrial uses; and the remainder was sold either to the government or to the export trade. Among Campbell Chain's customers were wholesalers, wholesale hardware distributors, industrial or mill supply houses and manufacturers. The company's freedom from dependence on any one customer was evidenced by the fact that its average invoice was approximately $300.

In the late 1960's, the principal managers of the company, Howard, Melvin and George Campbell, Jr., were approaching retirement age and no younger family members were available to replace them. Consequently, in the fall of 1967, it was decided that the business should be sold. The pursuit of that decision led eventually to the transaction we re-examine here—the purchase, on November 29, 1968, of all of the stock of the Campbell Chain Company by the Unitec Corporation.

The Unitec Corporation ("Unitec") was organized in 1959, mainly to provide engineering, installation, operation and maintenance services in the electronics and allied fields; its principal customer was the Federal Government. In 1963, the company began an acquisition program designed to expand its product line and to reduce its heavy dependence on government work. The first step in this direction was taken in February 1963, with the acquisition of the John B. Adt Company, a manufacturer of industrial processing equipment. Other acquisitions followed and over the next several years thirteen additional companies were brought into the Unitec fold. As a result of this expansion, by November 1968, Unitec employed over 1,300 people in 15 different divisions and its line of products included electronic and time measurement instruments, gears and transmissions, refrigeration equipment, tile, reinforced plastics and tobacco processors. Unitec, in the meantime, had become a public corporation (in 1967) and by November 1968, immediately prior to its acquisition of Campbell, 250,000 of its 858,058 outstanding shares of common stock were traded in the over-the-counter market.

Like Campbell, Unitec had experienced substantial growth in the 5-year period preceding the Campbell acquisition. From 1964 through 1968, sales growth, enhanced by acquisitions, had averaged over 28 percent (reaching $18.7 million in 1968) while net income, through 1967, had moved ahead at a similarly robust pace of 24 percent. In 1968, however, Unitec experienced an earnings decline: net income retreated by over 20 percent from the year preceding.

Campbell and Unitec began their negotiations in late 1967. In order to simplify these negotiations, all of the Campbell shareholders (plaintiffs included) agreed to allow the three Campbell brothers (Howard, Melvin and George, Jr.) to act as their agents with full authority to bargain and close the deal. At the same time, the Campbell shareholders also worked out the manner or scheme by which the expected consideration would be distributed among them.

Aside from these preliminary steps, however, little else is known concerning either the course or the content of the negotiations. Age and infirmity precluded the appearance at trial of any witness having first-hand knowledge of those events. Thus, while the record indicates that the Campbell brothers did not seek outside counsel or corporate acquisitions experts to aid them in their dealings with Unitec, there is nothing to suggest that this absence of professional guidance adversely impacted the bargain that was struck.

On or about July 10, 1968, Unitec and Campbell entered into a letter of intent for the purchase of all of Campbell's assets or—at Unitec's option—of Campbell's stock. The contemplated consideration, as set forth in this letter, was to be 100,000 shares of Unitec common stock and $31.6 million

payable in cash and long- and short-term notes. The letter of intent also stated that Unitec intended to finance the transaction with money to be loaned by the Prudential Insurance Company of America. At this time, Unitec also agreed to retain Melvin Campbell to manage the chain manufacturing business.

The final sale agreement was signed on October 9, 1968. It provided that, in exchange for Campbell's assets, Unitec agreed to pay:

(a) $21 million in cash;

(b) $6.6 million represented by three unregistered Unitec 6 percent notes payable over 3 years;

(c) $4 million represented by unregistered Unitec 6 percent notes convertible into Unitec common stock at a price of $30 per share, interest payable semi-annually and the principal due in 20 years; and

(d) 100,000 shares of unregistered Unitec common stock.

The non-cash portion of this consideration was restricted in several ways. First, since neither the notes nor the stock had been registered with the SEC, they could not be sold in a public market. Second, both the short- and the long-term notes were non-negotiable, thus subjecting any transferee to all defenses assertible by the issuer. Third, the notes were unsecured; and thus, in the event of default, the holder would have no rights or priorities in any particular Unitec assets. Fourth, the principal and interest due on the notes were subordinated in right of payment to both Unitec's obligations to Prudential and Unitec's pre-existing short-term obligations to various banks. Finally, the payment of principal or interest on the trust's notes was prohibited if at the time of, or as a result of such payment, Unitec would be in default under the terms of: (i) the Prudential notes; (ii) the Prudential loan agreement; (iii) any other senior debt; or (iv) any agreement creating such senior debt.

As a further condition of the sale, those Campbell shareholders who were to receive the Unitec stock and notes (per the shareholders' agreed-upon distribution scheme) were required to provide Unitec with an investment letter, acknowledging the securities' lack of SEC registration and affirming their intent to acquire the securities for investment purposes only and not for resale to the public. Neither the sale agreement nor the investment letter granted to the taxpayer any future registration rights for the Unitec stock and bonds.

A loan agreement between Unitec and Prudential for the amount of $26 million was signed on November 1, 1968. Under the terms of this agreement, Unitec was required, *inter alia*, to retain at least $11.5 million in consolidated working capital until June 30, 1970, and at least $12.5 million in consolidated working capital thereafter.[2] Any default in the performance of this requirement would give Prudential the right to declare the loan in default and immediately due and payable.

On November 29, 1968, the sale of Campbell to Unitec was consummated. At this time, the parties amended their agreement of October 9th, to provide for the transfer of Campbell's stock instead of its assets; the consideration that was to be paid remained unchanged.

Following the closing, the entire amount of the Unitec consideration was divided among the Campbell shareholders pursuant to their pre-existing agreement. No testimony was presented at trial to show the reasoning behind the distribution scheme. It appears, however, that the stock was valued at its over-the-counter bid price on the day of sale; that the notes were taken at their face value; and that the entire amount computed on this basis (along with the cash received) was allocated among the shareholders in proportion to their stock holdings. Accordingly, each Campbell shareholder received approximately $3,100

2. "Consolidated working capital" is the excess of consolidated net assets over consolidated net liabilities.

per share. The individual family members received a total of $16,475,807.56 in cash and $1 million in long-term notes; the trust received $4,524,192.44 in cash, the remainder of the notes ($9,600,000 face value) and the 100,000 shares of Unitec stock.

In its timely-filed fiduciary income tax return, the taxpayer reported a gain from the sale of its Campbell stock of $16,821,496.44. The taxpayer computed this figure by subtracting its basis in the Campbell stock from the sum of: the face value of the bonds, the over-the-counter bid price of the Unitec stock on the day of sale and the cash it received. The trust's resulting tax liability of $4,520,777.17 was paid on April 14, 1969.

Unitec, for its part, took the same view of the value of its securities that the trust had shown in its fiduciary return. Having liquidated the Campbell Chain Company shortly after its acquisition, Unitec, in its 1968 federal income tax return, computed its basis in the Campbell stock pursuant to section 334(b)(2) of the Internal Revenue Code of 1954 [3] by including the $21 million paid in cash, the face amount of the notes, and the stock at its trading price on the day of sale.

Within a year after acquiring Campbell, Unitec's net income plunged, the market price of its publicly-traded stock fell dramatically and its working capital dipped below the level required by the Prudential note agreement. Consequently, Unitec defaulted on the first $2.3 million installment due on the short-term notes it had issued to the Campbell trust. As a result of this default, the parties amended their purchase agreement to allow Unitec to issue replacement notes to the trust and to reduce the conversion price of the long-term notes to $25 per share.

Unitec's operating performance did not improve in 1970. The company therefore abandoned its plans for continued expansion and began divesting itself of its unprofitable branches.[4] In September of 1970, Unitec restructured its debt to Prudential and to various lending banks. As a part of this restructuring, Unitec was required to provide its creditors (other than the Campbells) with mortgages on all real estate and security interests in all inventories, accounts receivable and equipment. Payment of principal and interest on the replacement notes issued to the Campbells also was deferred.

Unitec's economic traumas continued and in the spring of 1971, the taxpayer foreclosed on the Unitec notes and the three Campbell brothers reassumed management of the remnants of the Unitec Corporation. In consideration for the cancellation of all notes and the waiver of all interest, Unitec issued to the trust one million shares of common stock, 152,333 shares of preferred, convertible stock and a non-interest bearing subordinated note for $357,000. The trust eventually sold this stock to a subsidiary of the Studebaker-Worthington Corporation for a total of $2,659,999.

Coincident with the foreclosure of the Unitec obligations in 1971, the Campbell trustees amended their 1968 fiduciary income tax return. In the amended return, the trustees took the position that the Unitec stock and notes received in 1968 had no ascertainable fair market value at the date of sale. Consequently, the amended return computed gain on the sale by considering only the $4,524,192.44 cash that the trust had received. As a result of this recomputation, a tax liability of only $1,168,120.92 was admitted and an overpayment of $3,352,656.25 was claimed.

The Internal Revenue Service examined the taxpayer's amended return, and, at the same time, audited Unitec's 1968 return. Because of the conflict between the parties' views of the Unitec securities, the Service questioned Unitec on the propriety of its calculations. In response to the Service's inquiry, Unitec asserted that the face value

---

**3.** Unless otherwise stated, all reference to the Code shall be to the Internal Revenue Code of 1954.

**4.** By the time these divestitures were complete, only the Campbell Chain division remained. Unitec reflected this fact by assuming the Campbell name.

of its notes " * * * represented a fixed and certain obligation * * *. Nothing in [the] * * * agreements indicates that Unitec intended or expected to pay less or that Campbell's shareholders intended or expected to receive less than the sales price of $31.6 million plus 100,000 shares of Unitec stock." Unitec also defended its use of the over-the-counter bid price on the day of sale in valuing its stock.

After reviewing both Unitec's and the trust's amended positions, the IRS decided that Unitec's valuation—and therefore also the trust's initial valuation—was the correct one. In December 1976, the Commissioner of Internal Revenue formally notified the trust of the rejection of the claim presented in the amended return. This lawsuit followed.

### DISCUSSION

Section 1001(b) of the Code provides that "[t]he amount realized from the sale * * * of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Accordingly, the court is called upon here to decide what fair market value—if any—the Unitec securities had on November 29, 1968.

At the outset we are met with two broad and squarely opposed contentions, the one being that the Unitec securities lacked any ascertainable fair market value (the taxpayer's position); the other (the government's position) espousing the view that the value of the Unitec securities was established by the very terms of the Campbell sale agreement. Neither position is sound.

A. *The Taxpayer's Basic Legal Position* : To address first the taxpayer's side of it, the argument put forth is of two parts. The first and principal position urged is that, as a matter of law, receipt of the Unitec securities (the notes and the stock) did not give rise to an "amount realized" within the meaning of the tax law (*i. e.*, section 1001(b)) because the value of those

securities could not be determined with fair certainty. Thus, it is claimed that as a cash basis taxpayer, the trust was entitled to "open transaction" treatment, that is, entitled to defer the recognition of its gain from the sale of shares until the amount of such gain became fixed through later events. As a second position, it is argued—this in respect to the notes only [5]—that even if the cash basis method of reporting dictated the recognition of income here, the securities' lack of ascertainable fair market value would render that effort impossible. Thus, the result would be the same: postponement of gain recognition until values became known.

The common factual ground for both parts of the taxpayer's argument is the assertion that there was no ready market for the Unitec securities. It is pointed out, for example, that both the notes and the stock were unregistered, thus precluding their sale to the public. Moreover, the notes were non-negotiable, unsecured, and subordinated in right of payment to the Prudential loan as well as to other various bank loans. These restrictions—argues the taxpayer—could not be taken lightly given Unitec's financial condition in 1968. The company then was in a critical stage of its development, due not only to the uncertainties suggested by the rapid acquisition program it had pursued, but also to the downturn in sales and earnings that followed in its wake. No less a concern was the substantial addition to debt and resulting deficit in net worth that the Campbell purchase would bring about. The taxpayer also points to the testimony of one of its witnesses to the effect that institutional investors (such as banks or insurance companies) would neither purchase the notes nor accept them as collateral for a loan; a market for these securities, to the extent any existed, was confined to the so-called "sophisticated investor". From all of this evidence, then, the taxpayer argues that the Unitec notes

---

5. The taxpayer actually has two "second positions." The first, dealt with here, concerns only the notes and is, in effect, another way of reaching the same conclusion reached by the principal argument. The second, which pertains to the Unitec stock, is truly an alternative. As such, it is dealt with at a later point.

were so commercially unattractive as to represent mere promises to pay rather than payment itself.

Similar uncertainties are claimed for the Unitec stock. In addition to the points already given, the taxpayer notes the exceedingly high turnover and marked price fluctuations of Unitec's relatively few publicly-traded shares as proof of extreme speculation and underlying uncertainty.[6] Therefore, the taxpayer concludes that the Unitec stock, like the notes, was not susceptible to valuation as a matter of law.

█ In treating with these contentions, we start with the observation that open transaction treatment is not warranted every time securities are restricted, or operations are deemed speculative. *North American Phillips Co. v. Commissioner*, 21 T.C.M. (CCH) 1497 (1962). To the contrary, the basic premise of an annual accounting for receipts and expenditures that underlies the federal income tax system dictates that, where the fair market value of an obligation received in a sale or exchange can be ascertained, that value must be included as an amount realized in the year of receipt under section 1001(b). *Warren Jones Co. v. Commissioner*, 524 F.2d 788, 794 (9th Cir. 1975). Open transaction treatment being an exception to this rule, therefore, is applicable only to the "rare and extraordinary" case. *McCormac v. United States*, 191 Ct.Cl. 483, 424 F.2d 607 (1970). In a word, it is confined in its application to those situations that present elements of value so speculative in character as to prohibit any reasonably based projection of worth. *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931); Treas.Reg. § 1.1001–1(a) (1958); Rev.Rul. 58–402, 1958–2 C.B. 15.

We do not have such a case here. The Unitec securities which the taxpayer received were not the obligations of an inherently speculative undertaking, as, for example, an oil or gas exploration venture. Nor were they obligations of a totally new and untested business whose only backing lay in the hope of things to come. Still less were they the promises of a business whose past record of performance foreclosed any reasonable basis for assuming future payment. On the contrary, these securities represented the obligations of and ownership interests in a combined enterprise whose previously independent halves (Campbell and Unitec) had prospered—and prospered well. Of course, experts might differ—as, in fact, they did here—on whether the past would be prologue to the future or whether the debt burden brought on by the Campbell acquisition would prove to be the business's undoing. But that sort of disagreement is really beside the point. What matters is that there was more than enough hard information in place from which willing buyers and willing sellers could construct soundly based equations of value. That there might be sharp differences in their respective judgments goes only to the question of the proper valuation obtaining on the transaction date; it presents no occasion for saying, however, that the task of valuation should be postponed until the competing assessments are resolved one way or the other.

Nor does it change the result to note that the taxpayer's experts saw no viable commercial market for the Unitec securities save perhaps the so-called "sophisticated investor". The decisive consideration is not the lack of an established trading market but the lack of any reasonable factual basis from which to determine the probable sum that fair negotiations between a hypothetical buyer and seller would produce. *Whitlow v. Commissioner*, 82 F.2d 569, 571–72 (8th Cir. 1936). That the evidence of record

---

**6.** During the year preceding the Campbell Chain acquisition, the bid-and-asked prices of the Unitec common stock ranged (as to the mean of the average bid and average asked prices) from a low of 13.7 to a high of 37.7. However, in the 4-month period preceding the acquisition (July 1968—October 1968) the trading range narrowed considerably, extending from a high of 32 in August 1968 to a low of 26 in October 1968. Also, during this same period, trading volume was unusually high. For example, in the peak month (July 1968), 252,516 Unitec shares changed hands, while in August 1968, the trading volume was only slightly less—224,282 shares.

does lend itself to such an approach is readily demonstrated by the expert testimony that was offered here. That testimony, which we consider in more detail later, is proof enough that determinants of value could be identified even in the absence of an actual trading market.

As to the numerous cases which the taxpayer has cited as claimed support for its position, it suffices to say that they (i) reflect results inappropriate to the facts presented here,[7] or (ii) are the product of earlier—and now discarded—law that excluded from the "amount realized" by a cash basis taxpayer (in a transaction involving receipt of a deferred payment obligation) any right to future income that was not freely convertible into cash. This so-called "cash-equivalency" doctrine was rejected by the court in *Warren Jones Co. v. Commissioner, supra,* 524 F.2d 788 (9th Cir. 1975). It was there pointed out that the legislative antecedents to section 1001(b) offered persuasive reason for concluding that "readily realizable market value" (*i. e.,* a statutory synonym for "cash equivalency") had been rejected by Congress in favor of the more definite rule that required recognition of income in any situation where "the fair market value of property received in an exchange can be ascertained." *Warren Jones Co. v. Commissioner, supra,* 524 F.2d at 792. This court holds to the same view.

B. *The Government's Basic Legal Position:* Turning now to the government's principal argument, it is that Unitec and Campbell had expressly agreed upon the value of the stock and notes and that this court is now bound by that agreement. In support of this argument, the government relies upon *Commissioner v. Danielson,* 378 F.2d 771 (3rd Cir.), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). In that case, the taxpayer (the seller of a business) attempted to sidestep ordinary income tax treatment on amounts received in payment for a covenant not to compete, by claiming an allocation of the total purchase price contrary to that expressed in the sales agreement. (The taxpayer had taken the position that the amounts ostensibly paid for the covenant not to compete were, in actuality, premiums paid for corporate receivables, and hence, were amounts entitled to capital gains treatment.)

In barring this attempted turnaround in position, the court saw as paramount the need for reasonable predictability in the tax consequences around which the parties' bargain had been shaped. That predictability, it was pointed out, was of no less concern to the buyer (to whom the covenant payments represented an amortizable expense) than to the government's interest in the sound administration of the tax law. Both interests dictated the court's holding to the effect that re-examination of the tax consequences of an agreement, as construed by the government, would not be permitted save upon such proof as would be admissible to alter the agreement's expressed intent in an action between the parties themselves.

The government maintains that the same factual and policy considerations that were determinative in *Danielson* are also present in this case. First, the government finds evidence of an agreement on the value of the Unitec notes in both the letter of intent and the contract of sale. Each of these documents identified a total Unitec payment of 100,000 shares of stock and $31.6 million—consisting of $21 million in cash and $10.6 million "represented by" long- and short-term notes. What the government sees as persuasive in this is that, in the breakdown of the total amount to be paid, the notes, like the cash, were apparently accorded their face value. That is to say, there was no discount applied to the notes to recognize a lower market value.

---

7. In this regard we note in particular the taxpayer's reliance upon *McShain v. Commissioner,* 71 T.C. 998 (1979), a case in which the Tax Court granted open transaction treatment to a non-recourse second mortgage note. In deciding that the fair market value of the note could not be ascertained at the time of its receipt, the court relied upon a number of factors including the fact that the business there involved (a new hotel) had experienced a below-standard occupancy rate during the first (and only) nine months of operation with resulting net losses throughout this period. Clearly, such a concern is not present in this case.

The government supports this claimed agreement concerning the cash value of the notes by pointing to the fact that the Campbell shareholders themselves, in distributing the Unitec consideration, drew no distinction between cash and non-cash proceeds. Each shareholder received approximately $3,100 per share, measured without regard to whether payment was in cash or not. Moreover, the taxpayer, in its initial 1968 tax return, treated the non-cash proceeds as equal in worth to their face amounts.

Finally, the government adds the fact that—according to its own expert testimony—the Campbell Chain Company was worth $34.6 million on the day of sale. Thus, if one assumes an exchange of like values (the so-called "barter-equation" theory of valuation), then the cash paid by Unitec, together with 100,000 shares of common stock (measured at the public trading price on the day of sale) would leave an assignable value for the notes equal to their face amount.

Having found this "agreement" between Campbell and Unitec, the government focuses upon the rationale of *Danielson*, namely, the concern for administrative convenience and the need to insist upon a common tax treatment by the parties to an agreement in order to avoid the government's being whipsawed by conflicting positions. In this connection, it is pointed out that while the taxpayer here is claiming that it did not realize on the sale of its shares an amount equal to the face value of the notes and the over-the-counter trading price of the stock, Unitec, did determine its cost or basis in those shares by valuing the notes at face amount and the stock, at its trading price on the transaction date. These two tax treatments are said to be antithetical; if the taxpayer's position is allowed to stand, the result would be injurious to the public purse inasmuch as an offsetting deficiency assessment against Unitec would now be barred because of the statute of limitations.

■ The government's argument is not persuasive; for neither the *Danielson* facts nor the *Danielson* rationale applies to this case. We address first the latter point. Unitec was an accrual basis taxpayer and, as such, it was obliged to recognize the full amount of its obligations as soon as all events necessary to fix those obligations had occurred. *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Putoma Corp. v. Commissioner*, 601 F.2d 734 (5th Cir. 1979); and Treas.Reg. § 1.451–1(a) (1978). Unitec's obligations were "fixed" on November 29, 1968—the date the Campbell shareholders transferred their stock in accordance with the terms of the sale agreement. The Campbells, on the other hand, were cash basis taxpayers who were required to report only that income actually or constructively received. Treas. Reg. § 1.451–1(a) (1978). Consequently, it was entirely proper for Unitec to have reported the full face value of the notes, and for the trust, under section 1001(b), to have reported only the notes' fair market value. Rev.Rul. 79–292, 1979–2 C.B. 287. Accordingly, what the government is complaining about now really has nothing to do with incompatible characterizations of the same transaction. Both positions here may logically succeed for they are reflections of different accounting requirements. In short, the concern expressed in *Danielson* —that the government not be whipsawed by factually opposing views arising out of a single transaction—is not present here.

On a perhaps more basic level, however, the greater problem the court has with the government's position is the absence of any credible evidence to support the claimed agreement between the parties. It is difficult to see, for example, how a bare bones recital as to the amount and form of consideration to be paid can double as an agreement intending to establish the fair market value for that consideration. (Not a single witness was produced to lend even a hint of color to such a contention.) Moreover, given the divergence in tax reporting between the parties that might reasonably have been anticipated (fair market value being the standard for the Campbells as cash basis taxpayers but not for Unitec, an accrual

basis taxpayer), it surely would have been in order to have set a common value if such were intended. The plain fact is, however, that neither the letter of intent nor the agreement of sale said anything on that score. Each simply recited the consideration that would be paid—cash, notes, and stock—and let it go at that.

This marked absence of any elaboration becomes all the more telling when one considers that the agreement for the sale of assets comprised some 41 pages containing well over 100 sub-headings that dealt with virtually every aspect of the transaction save the point for which the government now contends. Additionally, it is important to note that the agreement specifically recited that it "contains the entire understanding of the parties" and that "there are no restrictions, promises, warranties, covenants or understandings other than those expressly set forth herein." Given these considerations—the completeness and specificity of the sale agreement and its disavowal of any undertakings save those specifically enumerated—it is a fair bet that the parties agreed to no more than they said. Indeed, contract law would favor such a conclusion. *Restatement (Second) of Contracts* § 235 (Tent. Drafts Nos. 1–7, 1973).

The result reached here is further supported by the fact that, while the stated consideration never changed between the issuance date of the letter of intent (July 10, 1968) and the date of sale (November 29, 1968), the market value of that consideration did. In that time, the Unitec common stock receded in price from $31 per share to $28 per share. It is inconceivable, therefore, that if an agreement on value did exist, that that agreement would not have recognized the fall-back in share price by a compensating adjustment. No such adjustment was ever undertaken.

The competing considerations which the government has raised, do not favor a different view. Neither the value-undifferentiated scheme by which the Campbell shareholders distributed the consideration they received nor the comparable treatment accorded that consideration in the taxpayer's original income tax return, offers sufficient evidence from which to infer the existence of an agreement on value. Post-transaction evidence of that sort—explainable simply as unilateral actions taken without benefit of legal advice—is too ambiguous in import to overcome the probative significance of a sales contract whose terms reject any notion of an agreement going beyond what was recorded.

Nor can a "barter-equation" approach salvage the government's argument; for that approach is so fraught with assumptions as to render meaningless the very idea that there was an agreement on value between the parties.[8]

The conclusion having been reached that there was no agreement on value between the parties, the taxpayer, therefore, is not precluded from seeking a tax treatment different from the one it initially had claimed.

C. *Fair Market Value—The Parties' Positions:* In addition to their fundamental legal arguments the parties also relied upon expert testimony to develop alternative positions with respect to the fair market value of the Unitec stock and notes. That testimony, the many details of which we do not repeat here (the subject is amply covered in the accompanying findings), reflected a marked divergence both in approach and result that centered on two principal points: (i) the validity of using the public trading price of the Unitec shares as a starting point for valuation and (ii) the amount by which the price of the registered stock should be discounted in order to reflect the

---

**8.** Among the infirmities of this approach are: (i) the possibility that the two sides of the barter were unequal, (ii) the bootstrap character of the approach, since there is often no reason for starting on one side of the deal rather than the other, and (iii) the possibility that evidence on the value of one side of the consideration may be no more reliable than evidence on the value of the other side. *See Seas Shipping Co. v. Commissioner*, 371 F.2d 528, 529 30 (2nd Cir.), *cert. denied*, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1967). A barter-equation approach adds nothing of substance to the case.

restrictions placed on the trust's shares. These and other matters are taken up in the discussion that follows.

In his analysis of the value of the Unitec stock that was received by the Campbell shareholders, the plaintiffs' expert [9] began by rejecting altogether the market price of the publicly-traded Unitec shares. (On the transaction date appropriate here, November 29, 1968, the market price for the Unitec shares was $28.75.) That price, as the expert saw it, could not provide a credible gauge of value (even as a starting point) because the unusually high trading volume that the stock had experienced in the months preceding the Campbell acquisition was to him a sign of speculative excesses borne of the public's misperception of Unitec's prospects.[10] Given this view of the matter, the expert then went on to reconstruct a price for the registered Unitec shares that, for want of a better term, might be referred to as a price based upon intrinsic worth. Using an estimated current earnings per share of $1.08 (this for the combined Unitec-Campbell enterprise), an assumed price-earnings multiple of 15 and a net tangible asset value of zero, the figure the expert came to was $10.80.[11]

The expert's concern was not limited, however, to the unfounded optimism that he saw in the public share price of the Unitec stock; he also thought the Unitec shares to be a poor bet on even more fundamental grounds. Among the factors that were identified in this regard were the "material debt burden" (the witness's words) and the accompanying adverse debt-equity ratio brought about by the Campbell acquisition, the deficit in tangible net worth that resulted from the Campbell acquisition, the possible managerial and financial uncertainties caused by Unitec's several relatively small acquisitions shortly before the valuation date and, finally, the certainty of future share dilution because of the Prudential loan's requirement that no later than January 1, 1972, the company (i. e., Unitec) raise $3 million through the sale of common stock. It was in consequence of these concerns that the expert, after redefining the market price as $10.80 per share, then went on to apply additional discounts for lack of registration (35 percent), blockage [12] (10 percent) and distribution costs (10 percent) that led to a final per-share price of $4.97 or, $497,000 for the 100,000-share block received by the trust.

As to the Unitec notes, the taxpayer's expert maintained essentially the same negative assessment. With regard to the short-term, non-convertible notes, the expert testified that these could be sold—if at all—only to a hypothetical sophisticated investor at a "very substantial discount". The convertible notes, he claimed, could probably be sold for the value of the potential stock plus an unstated premium. But, given the speculation surrounding the newly diversified Unitec Corporation, the ex-

9. In addition to the expert testimony covered in the opinion, the taxpayer, during trial, had also introduced an appraisal report of the Unitec stock prepared by a New York City bank. That report, though covered in the accompanying findings, was not relied upon in the taxpayer's brief; hence, it is likewise ignored in our discussion.

10. *See* footnote 6, *supra.*

11. The formula the expert used was as follows:

| | |
|---|---:|
| Earnings per share | $ 1.08 |
| Times the earnings multiple | 15 |
| | $16.20 |
| Weighted twice | 2 |
| | $32.40 |
| Plus net tangible asset value * | + 0 |
| | $32.40 |
| Divided by 3 | 3 |
| Per-share fair market value | $10.80 |

* From a separate calculation, the expert had concluded that, because of the substantial premium paid for Campbell's goodwill (a non-tangible asset), Unitec after the acquisition, would show a deficit net tangible asset value of $4,566,000. He therefore factored an asset value of 0 into the fair market equation.

12. "Blockage" refers to the price-depressing effect that the release of the trust's 100,000 shares would have had on the public market of 250,000 shares. A "blockage discount" is the widely accepted method of compensating for this effect. *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 84 n.33 (3rd Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975).

pert cautioned that no sophisticated investor would exercise the conversion option and thereby lose what little priority the notes afforded. The sum and substance of his testimony was that any possible market for either type of note would be so hypothetical as to make ascertainable market value a contradiction in terms.

The government's expert saw the situation quite differently. His analysis was an extensive one that drew on many considerations ranging from an examination of the general economic and investment conditions prevailing at the time of sale to a detailed comparative study of both Campbell and Unitec with their respective industry counterparts.

Among the broad but very basic conclusions he came to was that, for the economy as a whole, and for Unitec in particular, the future looked promising. An ingredient in this conclusion—a separate step in the analysis—was the assumption that, given a continuation of historical growth rates (a figure the expert put at 20 percent), the combined corporate earnings would be more than sufficient to meet the interest payments arising out of the Prudential loan. Indeed, even in the absence of this assumed sales growth and without any earnings contribution from Unitec, the expert saw Campbell's own earnings as sufficient to meet required interest payments. In short, because the expert was convinced of the soundness of Unitec and saw its future as a promising one, he did not consider the company's heavy indebtedness or its negative net worth posture as having any critical bearing upon stock value.

Moreover, since Unitec's performance data and investor appraisal ratios were basically in line with those of similar companies (and justifiably so in the expert's opinion), it was his view that the market price of the Unitec shares should be taken as the starting point for valuation. Recognizing, however, that the shares held by the trust were less marketable than those traded over-the-counter, the expert applied a 35 percent discount to the public trading price—this to cover all of the factors present in the unregistered stock including unmarketability (due to lack of registration), blockage, costs of distribution, and "a certain amount of speculation involved in Unitec at the time." His conclusion was that the shares received by the trust had a fair market value of $18.20 per share or a total of $1,820,000.

Concerning the Unitec notes, the government's expert took the position—contrary to that of plaintiffs' expert—that the notes could have been valued on the day of sale. As to the long-term notes, these the expert saw as comparable to "B" rated bonds, that is, bonds lacking the characteristics of prime investment grade instruments in that their assurance of interest and principal payments or the maintenance of other terms of the debt contract over any long period of time would be subject to doubt. From his examination of some ten registered but otherwise comparable securities (i. e., unsecured bonds alike in total dollar value, maturity dates, coupon rates, and conversion features) it was ascertained that, in November 1968, such bonds were trading, on the average, at a value slightly above par. However, because the Unitec notes, like the stock, were unregistered, the expert recognized that their immediate resale was not possible; hence an adjustment in market price would be required. The discount he applied was 25 percent—a figure that was taken from an Institutional Investors Study undertaken and published by the Securities and Exchange Commission in 1971. As a result of this calculation, the expert's conclusion was that, on November 29, 1968, the long-term convertible notes had a fair market value of $76.27 per $100 face value, or, a total of $2,288,100.

Regarding the short-term notes, the absence of any comparable market data re-

quired the expert to develop a value by construction. His first step, therefore, involved a determination of the prevailing market rate or market premium applicable to risk oriented debt in general. This was accomplished by contrasting long-term yields on Treasury debt (*i. e.*, riskless debt) with the prevailing yields on long-term "B" rated debt. The risk differential made apparent by this comparison, 2.31 percent, was then added to the rates applicable to short-term Treasury debt. The result was a short-term yield for "B" rated debt of 7.28 percent. As his next step, the expert referred to standard yield-to-maturity tables, and, using as his guide the average maturity of the short-term notes (2 years), he determined that the short-term notes had a present value of $96.69 per $100 face amount. Again, however, given the notes' lack of registration, and thus lack of immediate marketability, the expert concluded that a 15 percent discount would be appropriate. The value thus reached was $82.20 per $100 face value, or, in this case, a total of $5,425,000.

D. *Fair Market Value—The Court's Determination:* In considering these competing assessments, we encounter problems that stand in the way of permitting the court to fully subscribe to either side's views. Considering first the position taken by the taxpayer's expert, the difficulties there begin with the expert's rejection of the market price of the publicly-traded Unitec shares in favor of his own perceptions as to what the market price ought to be. This is a step the court cannot endorse.

The fundamental issue raised in this case is one of determining—as the courts have so often put it in like situations—"the price at which the property [in question] would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). In deciding this issue, the proper starting point is the public trading market, for it is there that the ebb and flow of competing judgments between buyers and sellers finds its only real definitization. *See Amerada Hess Corp. v. Commissioner, supra*, 517 F.2d 75, 84 n.33 (3rd Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975). Even in a case such as this, where the problem eventually becomes one of having to adjust a market price to accommodate the potentially lower values that restricted securities may represent, it still makes better sense to begin with the collective judgment expressed in the market price than to start—as the plaintiffs' expert did—with a wholly subjective pronouncement of worth.

There may, of course, be circumstances relating either to the state of the market or to the securities to be valued that would compel rejection of the market price as a reliable indicator of value. Such circumstances, however, are not present here. The speculative excesses that the expert would purge from the public trading price of the Unitec shares are truly as much a part of the market's dynamics as the more conservative projections he would place in their stead. Indeed, one cannot reject a market price because of its presumed unfounded optimism without rejecting, at the very same time, the essence of the market concept itself. "Market cycles and susceptibilities", as the court expressed it in *Amerada Hess Corp. v. Commissioner, supra*, 517 F.2d at 84, "are, after all, part of the risk which the trader assumes and which is one of the determinants of value." Because the expert quite plainly ignored certain perceptions of value to which the market itself had given heed, his analysis, from the start, exhibits a precarious tilt. It is, at best, an intrinsic worth analysis; not a fair market analysis.

Moreover, it would not do to say that what the witness really meant to accomplish was not to disregard the market price *per se* but only to discount that price for the sake of finding a value that would be applicable to unregistered shares. The problem that this rationalization of the expert's analysis exposes is one of double discounting. The expert not only adjusted the market price from $28.75 to $10.80 (to elimi-

nate price excesses attributed to speculation and misperceptions of value) but he then went on to discount the $10.80 figure by another 35 percent for lack of registration, to arrive at an intermediate value (*i. e.*, before blockage and marketing discounts) of $7.02. Now the point here is that a discount for speculation and a discount for lack of marketability do not really address—as their separate labels might suggest—two basically different considerations. Rather, each is directed fundamentally to the same concern, differing perhaps only in emphasis: the capital risk associated with an adverse change in price and/or underlying values. Therefore, having once adjusted a share price to reflect a realignment with fundamental values (the purging of speculative excesses) it is unjustifiably repetitive to add another discount for lack of marketability.

Methodology, however, is not the only problem that the court has with the expert's approach. No less troublesome is the absence of data to support the results he came up with. True, he did identify such concerns as price speculation, negative net worth, potential share dilution and managerial uncertainties as the reasons for his basic pessimism about the Unitec shares. But the problem with any enumeration of this sort is that, to be analytically meaningful, it must be tied in to market statistics, that is, to relevant comparisons and contemporaneous performance ratios. We have none of that here. We do not know, for example, why, or from what source, the expert derived his price-earnings multiple of 15 or the reason for weighting that multiple in a 2 to 1 ratio with net worth (*see* footnote 11).

The void is particularly acute in a case such as this where the question centers on the value of unregistered shares. Since, by definition, such shares may not be distributed publicly (at least not for two to three years, according to the testimony) the risk they subsume is an adverse change in underlying values that, but for the restrictive provisions, would prompt a decision to sell. In these circumstances, the market value of restricted shares is heavily influenced—particularly so in the case of manufacturing enterprises—by anticipated earnings and sales growth. But, short of observing that Unitec's post-1967 earnings had gone into a decline and were "almost non-existent in the latest reported quarter" and that Campbell's record, though good, "did not provide an achievement of material percentage growth," no effort was made to evaluate earnings prospects in light of prior years' performance, or, short of that, to take those identified concerns and specifically address them in light of contemporary market behavior and trading patterns.

Nevertheless, it is quite apparent that the expert took the earnings decline as the shape of things to come, for nothing else would explain how an estimated earnings per share of $1.08 (this being what he had calculated for the combined enterprise as of September 30, 1968) could lead to an estimated fair market value for the unregistered stock of $4.97 per share. This less than 5 to 1 earnings-price multiple stands in marked, and here largely unexplained, contrast to the 25 to 1 multiple that applied to the publicly-traded Unitec shares on the transaction date of November 29, 1968.

All in all, there is not much that the court can take from this testimony "for, like any other judgments, those of an expert can be no better than the soundness of the reasons that stand in support of them." *Fehrs v. United States*, 223 Ct.Cl. 476, 495, 620 F.2d 255, 265 (1980).

But just as the court has problems with the views of plaintiffs' expert, so also does it encounter difficulties with the analysis offered by defendant's expert. To get right to the heart of the matter, the stumbling block is the expert's assumption that, for the combined Unitec-Campbell enterprise, net income could be expected to grow—as it had in the past—at an approximate annual rate of 20 percent. Given the facts at hand, this assumption is too optimistic.

The record shows, first of all, that in their fiscal years closest to the transaction date, neither company even came close to

the 20 percent figure. For its fiscal year ending June 30, 1968, Unitec actually suffered an earnings regression in excess of 20 percent (net earnings declined from $866,000 to $688,000), while Campbell, for its fiscal year ending April 30, 1968, recorded only a 4.7 percent earnings growth. While no one could say, of course, that this marked the pattern for the future, it is important to note that Unitec's growth in net income (when examined on a restated-for-pooling basis [13]) exhibited a constant decline, going from the high-water mark of a 39 percent gain (achieved over 1964–65) to the 20.6 percent earnings contraction experienced over 1967–68.[14] Moreover, the downward pattern continued, for in the quarter ended September 30, 1968, Unitec actually showed a loss from operations of $30,000. If nothing else, the constancy of such a retreat undermines the reasonableness of any growth expectations based upon averages. Indeed, it could only lend support to a prognosis of growth decline.

Secondly, it should be noted that, for both Unitec and Campbell, the latest two years' results also had shown a slow-down in sales growth. The figures for Unitec (again, expressed on a restated-for-pooling basis) were 7.6 percent for 1966–67 and 5.9 percent for 1967–68; for Campbell the respective figures were 7.6 percent and 3.8 percent. One conclusion, though certainly not the only one, that might reasonably be drawn from these numbers is that product demand was slowing and that, barring offsetting efficiencies in operation, income would follow suit. Again, the point is that the slow-down in sales is a caution signal—a reason to suspect rather than to accept the validity of the expert's assumption of a 20 percent growth rate in net income.

Moreover, it would not do to minimize either of these concerns by labeling them simply as temporary lapses more reflective of the economy as a whole than of the companies in particular. Even if that should be their explanation, they yet remain matters of substance that would logically translate into lowered expectations in the marketplace with corresponding adjustments in stock prices.

It is for these reasons, then, that the court cannot subscribe in full to the fairly buoyant optimism upon which the defendant's expert's judgment was founded. However, his view—that all factors considered, no more than a 35 percent discount was warranted—seems not that far off the mark. The Institutional Investors Study from which this figure was taken indicates that, in 1968, the average discount for unregistered stock amounted to 24.5 percent and that in nearly 89 percent of all transactions studied the discounts did not exceed 40 percent.

That same study also revealed that, while discounts were determined by many variables, earnings patterns played perhaps the most prominent role. Thus, as risk perceptions increased, so did the discounts—a fact which tended to explain the concentration of higher discounts among companies earning less than $1 million, and among those whose public shares were being traded in the over-the-counter market as opposed to the New York or American Stock Exchanges. For example, approximately 94 percent of all transactions involving discounts of more than 40 percent involved companies with earnings of less than $1 million; similarly, nearly 94 percent of all transactions with discounts of 40 to 50 percent involved the over-the-counter stocks of non-reporting companies.

In an effort to capture the simultaneous influence on discount size of some of the variables that had been examined, the study undertook a regression analysis. From this

---

**13.** The term "restated-for-pooling" refers to the consolidated earnings of the various companies that Unitec acquired in 1967 and 1968. For analytical purposes, this consolidation is carried back to a pre-acquisition period in order to provide an historical composite or restatement of earnings patterns. The same approach was used by defendant's expert.

**14.** The net income growth percentages were as follows: 1964-65: 39 percent; 1965-66: 36.4 percent; 1966-67: 28.3 percent; 1967–68: (20.6 percent).

analysis, average discounts on purchases of restricted common stock were obtained, the discounts being classified by institutional purchasers and trading markets. In the case of a reporting company trading publicly in the over-the-counter market, a sale of its unregistered stock to a venture capital enterprise (a rough equivalent to the term "sophisticated investor") was projected to carry a discount of 39.4 percent; and, for a non-reporting company, the projected average discount was 45.7 percent.

Given the difficulties inherent in the experts' testimony, and lacking, therefore, any certain guideline, the court adopts the approximate mid-point of these two figures —43 percent—as the discount appropriate to this case. Admittedly, this figure masks many assumptions. At the same time, however, it does offer the benefit of a consensus appraisal—one drawn not only from actual market experience but, more particularly, from that part of the risk spectrum that fits the situation at hand. Additionally, it is to be noted that the discount chosen is a comprehensive one, meaning, that like the study data from which it was drawn, it embraces both risk factors (i. e., lack of marketability) and marketing costs (i. e., blockage and distribution costs). Accordingly, by application of the 43 percent discount factor, it is determined that, on the day of their receipt, the unregistered Unitec shares received by the taxpayer had a fair market value of $16.387 per share or a total of $1,638,750 for the 100,000-share block.

Turning now to the valuation of the 6 percent long-term convertible notes, here too we depart from the defendant's expert. Again, the problem lies not so much with his analysis but with the discount he had chosen. His figure—a 25 percent discount—even though taken from the Institutional Investor Study and thus credible in its own right, yet remains subject to some doubt when applied to this case. Specifically, the study data does not reveal that the convertible debt there considered was characterized by all the infirmities that are met in the case of Unitec notes. For example, there is nothing in the study to show that the discount transactions there examined embrace convertible debt instruments whose rights to interest payment were subordinated—as the Unitec notes were—to substantial pre-existing loans.

This point is most important here because the premium which the expert had attached to the convertible notes (the premium being expressed in the form of a smaller discount than was applied to the shares) was in recognition of the fact that the notes offered not only an opportunity for capital appreciation (by virtue of their conversion feature) but also the promise of a fixed return, namely, interest at 6 percent. Yet, in this case, the company's extensive debt burden, highlighted as that was by Unitec's abrupt downturn in earnings, would surely cast some doubt on the certainty of that fixed return. Indeed, it would seem that the expert had acknowledged as much when he classified the notes as equivalent to "B" rated debt.

However, despite this characterization, the expert did not really see the interest payments on the Unitec notes as being in jeopardy for, in his "worst case" analysis, Campbell's own earnings would remain sufficient to cover the company's interest obligations even if Unitec should cease to be an earnings contributor. The problem with this analysis is that it stops short of the facts: in the quarter ending September 30, 1968, Unitec actually experienced a loss from operations of $30,000. It was, in other words, not simply a non-contributor to corporate earnings but rather, a drain on those earnings. Given this development—one which the expert's projections had not considered—the subordination feature of the Unitec notes would take on a special relevance. In the event of a continued poor performance on Unitec's part, payment of interest on the Unitec notes would have to be abandoned.

In the court's view, the continuous slide in Unitec's earning's growth accented finally by an earnings loss, diminishes the reasonableness of attaching any significant premium value to the interest aspect of the Unitec long-term notes. Accordingly, we

value the notes first of all, from the standpoint of their convertibility feature and then add a small premium to account both for some interest expectancy on the notes plus the priority which the notes would have over stock in the event of liquidation. Thus, since the notes were convertible into Unitec common stock at $30 per share, each $1,000 note would yield approximately 33 shares. Applying this conversion factor of 33 to the stock value determined previously, $16.387 per share, yields a per-note value of $540.77; the addition of a small premium (measured at roughly the same 6 percent rate promised by the notes), yields a final value per note of $600. In contrast then, to the 43 percent discount deemed applicable to the Unitec common stock, the total discount applicable to the long-term convertible notes would come to 40 percent. Therefore, the taxpayer's long-term notes, which had a face value of $3 million, had a fair market value on the date of receipt of $1,800,000.

As to the short-term notes, there would be even less reason than in the case of the long-term notes to endorse the discount which defendant's expert had applied. The fixed return promised by these notes, 6 percent, represented a debt both unsecured and subordinated. Hence, the same concerns which cast a shadow over the long-term notes would also diminish the appeal for the short-term notes. Moreover, the short-term notes offered no convertibility option. They were simply debt instruments exposed to the vicissitudes of interest rate changes (and hence, to the risks of an erosion of principal) while offering the holder hardly more equity protection than an owner of the common stock. In short, but for a slight priority which the notes might command in the event of a liquidation, the notes were on a par, value-wise, with the common stock. On this basis then, the discount deemed applicable to the short-term notes becomes 42 percent—a figure slightly better than that assigned to the stock and slightly less than that assigned to the long-term notes. This yields a value of $580 for each $1,000 worth of short-term notes; thus, for the total $6.6 million of short-term

notes which the taxpayer received, the fair market figure becomes $3,828,000.

■ In sum, for the entire package of unregistered securities which the taxpayer received, the fair market value on the transaction date is $7,266,750. This sum, together with the cash received ($4,524,-192.44), less the taxpayer's basis ($177,696), yields an amount realized of $11,613,246.44 and a resulting tax liability of $3,121,059.98. (The applicable tax rate shown in the taxpayer's initial and amended tax returns is .26875). Having initially reported and paid a tax liability of $4,520,777.17, the taxpayer is, therefore, entitled to a refund of $1,399,717.19, together with statutory interest thereon.

One final point remains. Both at trial and in post-trial submissions, the taxpayer has pointed to Unitec's eventual demise as proof of the undesirability of the company's securities on the date of sale. By now, too many words have been spent discussing the relevancy or irrelevancy of such post-transaction events to the valuation question at hand.

Suffice it to say that the court is cognizant of the many cases plaintiffs cite in support of the admission of post-transaction evidence. The probative value of this evidence is truly negligible, however; so that even if the court were to take post-transaction events into consideration, the taxpayer's case would not be altered. All that Unitec's downfall can show is that the company was indeed in trouble on November 29, 1968. But the question before the court is not whether the seeds of Unitec's destruction had been planted by November 1968, but rather, whether 1968 investors were watching them grow. The proper focus for our inquiry, therefore, is not on Unitec's *real* strength or weakness, but rather, on the public's perceptions thereof. The discounts applied here are directed to these perceptions and not to some notion of superior economic truth which neither the Campbell shareholders themselves nor the market as a whole was able to perceive.

### CONCLUSION OF LAW

On the basis of the facts and for the reasons herein discussed, judgment is entered in the taxpayer's favor for $1,399,-717.19 together with statutory interest thereon.