T.C. Memo. 1996-559


UNITED STATES TAX COURT


HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10663-91, 13074-91    Filed December 30, 1996.
               28588-91,  6351-92.


<u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>,
<u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>,
<u>Amanda B. Scott</u>, <u>Walter T. Henderson, Jr.</u>, <u>William H. Bradley</u>,
and <u>John W. Bonds, Jr.</u>, for petitioners in docket No. 10663-91.

<u>N. Jerold Cohen</u>, <u>Randolph W. Thrower</u>, <u>J.D. Fleming, Jr.</u>,
<u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>, <u>Reginald J. Clark</u>,
<u>Amanda B. Scott</u>, <u>Walter T. Henderson, Jr.</u>, <u>William H. Bradley</u>,
<u>John W. Bonds, Jr.</u>, and <u>Daniel R. McKeithen</u>, for petitioners in
docket No. 13074-91.

<u>N. Jerold Cohen</u>, <u>Walter H. Wingfield</u>, <u>Stephen F. Gertzman</u>,
<u>Amanda B. Scott</u>, <u>Reginald J. Clark</u>, <u>Randolph W. Thrower</u>, <u>Walter</u>

T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 28588-91.

N. Jerold Cohen, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 6351-92.

Robert J. Shilliday, Jr., Vallie C. Brooks, and William B. McCarthy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  These cases were consolidated for purposes of trial, briefing, and opinion and will hereinafter be referred to as the instant case.[1]  Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as shown below.

---

[1]     The instant case involves several issues, some of which have been settled or decided.  The issues remaining for decision involve matters falling into three reasonably distinct categories, which the parties have denominated the HealthTrust issue, the MACRS depreciation issue, and the captive insurance or Parthenon Insurance Co. issues.  Issues involved in the first two categories were presented at a special trial session together with certain tax accounting issues previously decided, and the captive insurance issues were severed for trial purposes and were presented at a subsequent special trial session.  Separate briefs of the parties were filed for each of the distinct categories of issues.  We addressed the tax accounting issues in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105; Hospital Corp. of Am. v. Commissioner, 107 T.C. 73 (1996); and Hospital Corp. of Am. v. Commissioner, 107 T.C. 116 (1996).  The instant opinion addresses the HealthTrust issue.  Other issues will be addressed in one or more separate opinions subsequently to be released.

| Tax Year Ended | Deficiency |
|---|---|
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue to be decided in the instant opinion is the amount petitioners realized during tax years ended 1987 and 1988 from the sale of the stock of certain subsidiaries. To ascertain the amount realized, we must decide the fair market value of preferred stock and common stock warrants petitioners received as part of the consideration for the sale of that stock.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91 and are incorporated herein by reference. We find as facts the parties' stipulations of fact.

During the years in issue, petitioners were members of an affiliated group of corporations whose common parent was Hospital Corporation of America (HCA), which was incorporated under the

laws of the State of Tennessee.[2] HCA maintained its principal offices in Nashville, Tennessee, on the date the petitions were filed. For each of the years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated Federal corporate income tax return (consolidated return) on Form 1120 with the Director of the Internal Revenue Service Center at Memphis, Tennessee.

Petitioners' primary business is the ownership, operation, and management of hospitals. In Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105, we set forth a detailed description of petitioners' hospital operations, which will not be reiterated here. We incorporate herein our findings of fact contained in that Memorandum Opinion. In Hospital Corp. of Am. v. Commissioner, 107 T.C. 73 (1996), issued September 12, 1996, we addressed an accounting issue relating to the sale of the stock involved in the instant opinion. Except to the extent they apply to the instant opinion, we do not restate below the findings of fact contained in that Opinion, but we incorporate herein those findings of fact.

---

[2]  On Feb. 10, 1994, HCA was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and the subsidiary changed its name to HCA-Hospital Corp. of America. On that same date, the parent changed its name to Columbia/HCA Healthcare Corp.

At the outset of its organization, HCA generally placed all newly constructed or acquired hospitals in separate corporations. During later years, in some cases, HCA placed all newly acquired or newly constructed hospitals located in a particular State in a separate corporation rather than having a separate corporation for each hospital in that State.  In a few instances, HCA acquired a group of hospitals that, for various business reasons, were placed in a single corporation or were allowed to remain in the acquired corporation.

The Reorganization

During early 1987, HCA's management (HCA Management) decided that petitioners could function more efficiently if HCA operated a smaller, more homogeneous group of hospitals than the approximately 250 facilities petitioners then owned and operated. HCA Management concluded that petitioners would retain the large, full-service hospitals, and that they would sell facilities that did not meet those criteria.  HCA Management ultimately selected 104 hospitals (Hospitals) and approximately 90 professional office buildings and related medical facilities to divest from the HCA organization.  Hereinafter, we shall refer to the Hospitals and related medical facilities collectively as the Facilities.

Located primarily in suburban and rural areas in 22 States of the United States, the Facilities ranged in size from 1,500

square feet to 379,300 square feet.  Approximately 40 percent of the Hospitals were the only hospitals for the communities they served, and approximately 20 percent of the remaining Hospitals were one of two hospitals for the communities they served. Petitioners acquired or constructed 15 of the Hospitals during 1984, 1985, or 1986.  The Hospitals had an average age of approximately 7.5 years.  Prior to its decision to divest the Hospitals, HCA had invested substantial amounts of capital in the Hospitals for construction, additions of modern equipment, and maintenance of physical plants.  HCA eliminated 20 hospitals from the pool of hospitals being considered for divestiture because those hospitals needed extensive capital expenditures for construction, modernization, or maintenance.

As a group, the Hospitals had not performed as well financially as the hospitals petitioners retained.  For the year ended 1986, the Hospitals had operating revenues of approximately $1.5 billion, operating expenses of $1.3 billion, and net income of $7.4 million.

During 1987, Bankers Trust Co. (Bankers Trust) suggested that petitioners sell some hospitals in a leveraged transaction to a corporation controlled by an employee stock ownership plan and trust (ESOP).  HCA Management preferred a leveraged ESOP buyout for the divestiture of the Facilities because that type of

transaction would help petitioners obtain a greater amount of cash consideration for the Facilities.[3]

In furtherance of the reorganization, petitioners activated HCA Holding Corp., which prior to that time had been an inactive HCA subsidiary incorporated under the laws of the State of Delaware. HCA Investments, Inc. (HCAII), another wholly owned HCA subsidiary, owned all of the stock of HCA Holding Corp., which latter corporation was renamed HealthTrust, Inc.--The Hospital Co. (HealthTrust).

HCA Management selected R. Clayton McWhorter (Mr. McWhorter), HCA's then president and chief operating officer, to become chairman and chief executive officer of HealthTrust. At that time, he had been employed by HCA for 17 years and had been a member of HCA's executive management since 1976. Mr. McWhorter chose Charles N. Martin, Jr. (Mr. Martin), HCA's then executive vice president for marketing and development, to become president and chief operating officer of HealthTrust. Mr. Martin had joined HCA in 1980, after serving as president of General Care Corp. Mr. McWhorter picked Donald S. MacNaughton (Mr. MacNaughton), then chairman of HCA's executive committee, to

---

[3] In a leveraged ESOP buyout the funds borrowed to finance the acquisition to a large extent are repaid with tax-deductible contributions to the ESOP, and the lenders generally charge less interest because they receive tax benefits with respect to the interest they receive.

become chairman of the executive committee of HealthTrust. Mr. MacNaughton had joined HCA in 1978 following his retirement from the Prudential Insurance Co. of America, for which he had served as chairman and chief executive officer. Mr. McWhorter selected other HCA employees to fill other key management positions with HealthTrust. HealthTrust Management assumed operating responsibility for the Facilities effective June 22, 1987.

HCA Management decided to effectuate the reorganization through a sale of stock of the subsidiaries that owned the Facilities. In some instances, HealthTrust was to acquire every hospital, office building, or related facility owned by a subsidiary (Subsidiary). In those instances, prior to the sale to HealthTrust, HCA transferred all of the Subsidiary's stock to HCAII in exchange for stock of HCAII, and HCAII then sold all of the Subsidiary's stock to HealthTrust. In other instances, HealthTrust was not to acquire every hospital, office building, or related facility owned by a subsidiary. In those instances, the subsidiary (New Parent) contributed to a newly formed subsidiary (New Subsidiary) the assets that HealthTrust would acquire. The New Parent immediately thereafter transferred all of the stock of the New Subsidiary to HCAII in exchange for stock of HCAII, and HCAII then sold all of the stock of the New Subsidiary to HealthTrust. Hereinafter, we shall refer to the Subsidiaries and to the New Subsidiaries collectively as the

Subsidiaries. After the reorganization, HealthTrust became the second largest hospital management company (after HCA) in the United States measured by the number of domestic hospitals owned, and the fourth largest hospital management company (after HCA, Humana, Inc., and American Medical International, Inc.) measured by the number of domestic beds owned.

The Purchase and Reorganization Agreement

HCA, HCAII, and HealthTrust executed a Purchase and Reorganization Agreement on May 30, 1987 (the Original Agreement), in which HCAII agreed to sell all of the stock of the Subsidiaries to HealthTrust for a combination of cash, preferred stock, and warrants to acquire shares of HealthTrust common stock (the Acquisition).

The Original Agreement provided in pertinent part as follows:

ARTICLE I

PURCHASE AND SALE OF STOCK;
RELATED MATTERS

1.01  Purchase and Sale of Stock.  Subject to the terms and conditions of this Plan, at the Closing provided for in Section 1.03 hereof (the "Closing"), Seller shall sell, convey, assign, transfer and deliver to Buyer (i)  all of the outstanding shares of capital stock owned of record and beneficially by Seller (the "Subsidiary Shares") of the subsidiaries of Seller set forth on Schedule 1.01(a) hereto (the "Subsidiaries") which hold the assets of the hospitals (the "Hospitals") and related medical facilities and professional office buildings set forth on Schedule 1.01(b) hereto (together with the Hospitals, the "Facilities"), and (ii)  all of the New Notes (as defined in Section 4.10 hereof), and Buyer shall purchase the Subsidiary Shares and the New Notes from Seller.

1.02  Purchase Price.  Subject to the terms and conditions of this Plan, in reliance on the representations, warranties and agreements of Parent and Seller contained herein, and in consideration of the aforesaid sale, conveyance, assignment, transfer and delivery of the Subsidiary Shares and the New Notes, Buyer shall pay to Seller the aggregate amount of $2,099,970,000, payable (i) $1,113,970,000 in cash, subject to Section 4.10 hereof (the "Cash Purchase Price"); (ii)  $300,000,000 in (x) shares of Class A Preferred Stock of Buyer and Class B Preferred Stock of Buyer having substantially the terms set forth on Schedule 1.02(a) hereto (the "Preferred Stock") and (y) warrants to purchase shares of common stock of Buyer having substantially the terms set forth on Schedule 1.02(b) hereto (the "Warrants"); and (iii)  through the assumption of all of the obligations of Seller under the Bridge Loan (as defined in Section 4.10 hereof) of $686,000,000 plus the amount of any additional borrowings otherwise assumed by Buyer pursuant to this Plan.

*        *        *        *        *        *        *

4.10  Refinancing of Facilities Debt; Adjustment.

(a)  Prior to the Closing Date, Seller shall borrow such amounts as are necessary (including, without limitation, a borrowing in the amount of $686,000,000 from

DBL [Drexel Burnham Lambert Incorporated], the "Bridge Loan") for all of the Subsidiaries to refinance all or substantially all of the long-term debt presently allocated to the Facilities by Parent as listed on Schedule 4.10 hereto, such allocated long-term debt having been evidenced by promissory notes of the Subsidiaries to Parent (the "Existing Notes").  The Bridge Loan shall contain terms and provisions reasonably acceptable to Buyer.

(b)  If any portion of the long-term debt related to any Facility (including, without limitation, long-term debt presently allocated to the Facilities by Parent) can, according to its terms, be assumed by a Subsidiary, and if Buyer and Parent mutually agree to have a Subsidiary assume that debt, the Subsidiary shall assume that debt, the principal amount of the Existing Note related thereto shall be cancelled and the Cash Purchase Price shall be reduced by the principal amount of the debt so assumed.  Seller shall lend the proceeds of the Bridge Loan to each of the Subsidiaries in the amount of the principal amount of the Existing Notes not so cancelled in exchange for promissory notes (the "New Notes") of each of the Subsidiaries having terms substantially similar to the terms of the promissory note underlying the Bridge Loan.  Seller shall cause each of the Subsidiaries to repay the principal amount of the Existing Notes not so cancelled prior to the Closing. Parent shall use its best efforts to apply all funds paid by the Subsidiaries in repayment of the Existing Notes to discharge all or substantially all of that portion of the indebtedness of Parent allocated to the Subsidiaries, either, to the extent possible, by direct payment to the obligees of such indebtedness or to a trustee through advance refunding of such indebtedness.  The repayment or the advanced refunding of such indebtedness shall occur to the extent possible as promptly as practicable following the Closing.

(c)  If Parent shall borrow, or cause Seller or the Subsidiaries to borrow any funds in addition to the Bridge Loan in order to refinance any long-term debt presently allocated to the Facilities, Parent or Seller shall apply the proceeds of such borrowing to such refinancing in the same manner as the proceeds of the Bridge Loan, Buyer shall assume all of the obligations of Parent and Seller in connection with such borrowings at the Closing and the Cash Purchase Price shall be reduced by the amount of the debt so assumed; provided, however, that the terms of

such borrowings to be assumed by Buyer pursuant to this Section 4.10(c) shall be mutually agreeable to Parent and Buyer.

4.11 <u>Supplementary Agreements</u>. On or prior to the Closing, Parent, Seller and Buyer shall enter into separate agreements (collectively, the "Supplementary Agreements") relating to the subject matters and having substantially the terms and conditions set forth in the following Schedules and as otherwise mutually agreed to by the parties thereto:

(i) purchases of supplies through arrangements with Parent (Schedule 4.11(a)):

(ii) provision of computer services (Schedule 4.11(b));

(iii) provision of transition services (Schedule 4.11(c));

(iv) purchase of the Warrants (Schedule 1.02(b));

(v) Preferred Stock subscription (Schedule 1.02(a));

(vi) participation in Equicor's provider network (Schedule 4.11(d));

(vii) assumption of certain obligations and contracts by Buyer (Schedule 4.11(e)); and

(viii) sublease of certain office space (Schedule 4.11(f)).

\* \* \* \* \* \* \*

ARTICLE V

CONDITIONS TO CLOSING

5.01 <u>Conditions Precedent to Obligations of Buyer, Parent and Seller</u>. The respective obligations of Buyer, on the one hand, and Parent and Seller, on the other hand, to consummate the transactions contemplated by this Plan are subject to the satisfaction, at or prior to the Closing Date, of each of the following conditions, any or all of which may be waived in whole or in part by Buyer, on the one

hand, or Parent and Seller, on the other hand, to the extent permitted by applicable law:

    *       *       *       *       *       *       *

        (e) <u>Conclusion of the Committee</u>. The Committee, after considering the written opinions of its advisers and such information as it may deem necessary or advisable, shall have reached the conclusions, evidenced by a written resolution of the Committee, that the purchase by the Buyer ESOP of shares of the common stock of Buyer at the price agreed upon by the Committee and the seller of such shares is fair to and in the best interest of the Buyer ESOP and its participants and beneficiaries, and that such price constitutes "adequate consideration" for the purchase of such shares (within the meaning of Section 3(18) of ERISA), and shall have directed the trustee of the trust established under the Buyer ESOP to make such purchase as contemplated in the appropriate agreement or agreements.

    *       *       *       *       *       *       *

## ARTICLE IX

### MISCELLANEOUS

    *       *       *       *       *       *       *

    9.09 <u>Entire Agreement; Representations and Warranties</u>. This Plan and the exhibits, schedules and other documents referred to herein or delivered pursuant hereto which form a part hereof contain the entire understanding of the parties hereto with respect to its subject matter. This Plan supersedes all prior agreements and understandings, oral and written, with respect to its subject matter. Other than as specifically set forth in Articles II and III hereof, the parties make no representations or warranties of any kind, whether express or implied, in connection with the transactions contemplated hereby.

    *       *       *       *       *       *       *

Schedule 1.02(a) of the Original Agreement described the preferred stock to be issued by HealthTrust as part of the reorganization. Pursuant to that schedule, HealthTrust would

issue 2 million shares of class A preferred stock, with a liquidation value of $50 per share, for a total amount of $100 million, and 4 million shares of class B preferred stock, without par, for a total amount of $200 million. Dividends on both the class A preferred stock and the class B preferred stock could be payable in additional shares of the applicable Preferred Stock. Hereinafter, we shall refer to the class A preferred stock and the class B preferred stock collectively as the Preferred Stock.

Schedule 1.02(b) of the Original Agreement described the warrants to be issued by HealthTrust (Common Stock Warrants) as part of the reorganization. Pursuant to that schedule, HealthTrust would issue 18 million Common Stock Warrants, each transferable and exercisable by the holder to purchase one share of HealthTrust common stock (Common Stock). Hereinafter, we shall refer to the Preferred Stock and Common Stock Warrants collectively as the Securities.

HCA Management employed a financial model (model) developed by Bankers Trust to devise the stated purchase price of approximately $2.1 billion. The model used a number of factors, including the value of the assets to be divested and the Hospitals' projected cash-flow from operations, to estimate the debt load the Hospitals could support and the amount of cash consideration petitioners could obtain. Bankers Trust advised petitioners that, in order to acquire the financing for the

Acquisition as structured, petitioners must possess an equity interest in HealthTrust equal to approximately 15 percent of the total transaction.  The amount stated for the Securities, therefore, represented the residue after subtracting from the purchase price the cash consideration HealthTrust would pay HCAII and the HCA debts HealthTrust would assume.  HCA Management considered the $2.1 billion stated purchase price to be a full but fair price for the Facilities.

The Supplement and Amendment to the Purchase and
Reorganization Agreement

During April and May 1987 the operating results of the Hospitals reflected a decline in financial performance. Subsequently, sometime between May 30, 1987, and July 1987, Drexel Burnham Lambert Incorporated (Drexel), an investment banking firm retained by petitioner to arrange financing for the reorganization, advised petitioners that, because of the decline, it would be difficult to place the debt securities to be used as part of the Acquisition, and, accordingly, the debt to be placed on HealthTrust would have to be reduced from $1.8 billion to $1.6 billion.  The lenders also required that certain other changes be made to the Original Agreement.

Consequently, on September 17, 1987, HCA, HCAII, and HealthTrust executed a Supplement and Amendment to the Purchase and Reorganization Agreement (Amended Agreement) to change the composition of the consideration to be paid for the Subsidiaries. The principal changes in the Amended Agreement were that (a) the

cash consideration was decreased by $258,805,719 to $855,164,201; (b) the total liquidation value of the Preferred Stock to be issued to HCAII was increased by $160 million to $460 million; (c) the number of Common Stock Warrants to be issued to HCAII was decreased from 18 million to 17,741,379; and (d) the amount of the debt to be assumed by HealthTrust was increased by $98,805,719 to $784,805,719. The stated purchase price remained $2,099,970,000.

The lenders also required HCA to guarantee the Guaranteed Debentures pursuant to the terms of a guarantee agreement (Guarantee Agreement) that HCA executed. The Guarantee Agreement provided that the HCA guarantee would extend to debt of HealthTrust which was incurred to refinance the Guaranteed Debentures. HCA was never called upon to make any payments pursuant to the Guarantee Agreement.

Additionally, the lenders demanded that HCA and HealthTrust enter into a make well agreement (Make Well Agreement) as of September 17, 1987, that HCA and HealthTrust executed. The Make Well Agreement required HCA to purchase up to 800,000 shares of class A preferred stock from HealthTrust at $50 per share for an aggregate investment of up to $40 million if HealthTrust's cash-flow (as defined in the Make Well Agreement) for any 12-month period ending on the last day of any calendar quarter was less than certain specified amounts. The number of shares required to be purchased would be determined by the amount of the deficit.

HCA's obligations under the Make Well Agreement terminated on the earlier of August 31, 1990, or the date on which the cash-flow of HealthTrust during the immediately preceding four full fiscal quarters equaled or exceeded $300 million.  HCA never purchased any stock pursuant to the Make Well Agreement.

Excepting negotiations relating to the selection of the Facilities to be divested, HCA Management and HealthTrust Management did not negotiate between themselves the terms of the Acquisition.  HCA Management representatives conducted all negotiations relating to the terms of the Acquisition with Bankers Trust, Drexel, and the lenders.  HCA Management representatives responsible for negotiating the financial terms of the Acquisition with Drexel considered the Preferred Stock to have a fair market value less than its liquidation value of $50 per share, but they formed no opinion as to what was the fair market value of the Securities.  HCA Management did not negotiate the fair market value of the Securities with HealthTrust Management, Drexel, or any of the lenders.

Section 1.02 of the Amended Agreement reads as follows:

"1.02  Purchase Price.  Subject to the terms and conditions of this Plan, in reliance on the representations, warranties and agreements of Parent and Seller contained herein, and in consideration of the aforesaid sale, conveyance, assignment, transfer and delivery of the Subsidiary Shares and the New Notes, Buyer shall pay to Seller the aggregate amount of $2,099,970,000 payable (i) $855,164,281 in cash (the "Cash Purchase Price"); (ii) $460,000,000 in (x) shares of Class A Preferred Stock of Buyer and Class B Preferred Stock of Buyer having substantially the terms set forth on Schedule 1.02(a) hereto (the "Preferred Stock") and (y) warrants to purchase shares

of common stock of Buyer having substantially the terms set forth on Schedule 1.02(b) hereto (the "Warrants"); (iii) through the assumption of all of the obligations of Seller under the Bridge Loan (as defined in Section 4.10 hereof) of $777,041,795; and (iv) through the assumption by the Subsidiaries of all of the obligations of Parent as set forth on Schedule 4.10(b) hereto of $7,763,924."

Additionally, amended section 4.10 reads as follows:

"4.10  <u>Refinancing of Facilities Debt; Adjustment</u>.

(a)  Prior to the Closing Date, Seller shall borrow such amounts as the parties agree are necessary (including, without limitation, a borrowing in aggregate amount of $777,041,795, such amount being borrowed in the amount of $521,940,000 net proceeds from DBL [Drexel] and $255,101,795 from certain Banks, collectively the "Bridge Loan") for all of the Subsidiaries to refinance substantially all of the aggregate long-term debt presently allocated to the Facilities by Parent of $784,805,719 as listed on Schedule 4.10(a) hereto, such allocated long-term debt having been evidenced by promissory notes of the Subsidiaries to Parent (the "Existing Notes").  The Bridge Loan shall contain terms and provisions reasonably acceptable to Buyer.

(b) Parent and Buyer agree that certain Subsidiaries shall at the Closing assume that portion of the long-term debt related to certain Facilities (including, without limitation, long-term debt presently allocated to the Facilities by Parent) in the amount of $7,763,924 as set forth on Schedule 4.10(b) hereto.

(c)  Seller shall lend the proceeds of the Bridge Loan to each of the Subsidiaries in the amount of the principal amount of the Existing Notes not so cancelled in exchange for promissory notes (the "New Notes") of each of the Subsidiaries having terms substantially similar to the terms of the promissory note underlying the Bridge Loan. Seller shall cause each of the Subsidiaries to repay the principal amount of the Existing Notes not so cancelled prior to Closing.  Parent shall use its best efforts to apply all funds paid by the Subsidiaries in repayment of the Existing Notes to discharge all or substantially all of that portion of the indebtedness of Parent allocated to the Subsidiaries, either, to the extent possible, by direct payment to the obligees of such indebtedness or to a trustee through advance refunding of such indebtedness.  The repayment or the advanced refunding of such indebtedness

shall occur to the extent possible as promptly as practicable following the Closing.

(d) Buyer hereby acknowledges that Parent shall remain a guarantor pursuant to certain of the debt set forth on Schedule 4.10(b). Buyer hereby indemnifies and holds Parent harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature which may be imposed on or incurred by, or asserted against, Parent and in any way relating to or arising out of Parent's guaranty of such obligations."

Pursuant to Schedule 1.02(a) of the Amended Agreement, 5,200,000 shares of class A preferred stock, with a liquidation value of $50 per share, for a total amount of $260 million, and 4 million shares of class B preferred stock, with a liquidation value of $50 per share, for a total amount of $200 million, were to be issued to HCAII as part of the reorganization. Pursuant to Schedule 1.02(b) of the Amended Agreement, HealthTrust would issue to HCAII 17,741,379 Common Stock Warrants, each transferable and exercisable by the holder to purchase one share of HealthTrust Common Stock. HealthTrust was required to file at its expense a registration statement with the Securities and Exchange Commission (SEC) as soon as practicable after the closing of the Acquisition and to use its best efforts to take all actions necessary to permit public resale of the Securities.

Hereinafter, we shall refer to the Original Agreement as supplemented and amended by the Amended Agreement as the Reorganization Agreement.

The Preferred Stock

The 5,200,000 shares of class A preferred stock that HealthTrust issued to HCAII provided for a liquidation preference of $50 per share, or $260 million in the aggregate, plus accrued but unpaid dividends computed through the date of liquidation. Dividends were payable at an adjustable rate indexed to the performance of certain market rate financial instruments. The Reorganization Agreement required HealthTrust to pay dividends in additional shares of class A preferred stock until September 30, 1992. Dividends paid in stock of the issuing company sometimes are referred to as pay-in-kind dividends or as PIK dividends. The Reorganization Agreement further required HealthTrust to pay PIK dividends in class A preferred stock after September 30, 1992, if, pursuant to the terms of HealthTrust's loan agreements, HealthTrust could not pay cash dividends. (The Original Agreement had provided that the payment of PIK dividends on the class A preferred stock would be optional.) For the initial dividend period of September 17, 1987, to September 30, 1987, HealthTrust computed a dividend rate under the contract on the class A preferred stock of 14 percent.

The 4 million shares of class B preferred stock HealthTrust issued to HCAII provided for a liquidation preference of $50 per share, or $200 million in the aggregate, plus accrued but unpaid dividends computed through the date of liquidation. The Reorganization Agreement required HealthTrust to pay dividends in additional shares of class B preferred stock until September 30,

1992, at an annual rate of $6.25 per share or 12.5 percent. The Reorganization Agreement further required HealthTrust to pay PIK dividends in class B preferred stock after September 30, 1992, if, pursuant to the terms of HealthTrust's loan agreements, HealthTrust could not pay cash dividends. (The Original Agreement had provided that the payment of PIK dividends on the class B preferred stock would be optional.)

The Reorganization Agreement required HealthTrust to redeem 10 percent of the then outstanding Preferred Stock in each of years 21 through year 30 following the Acquisition at the stated liquidation value plus accrued but unpaid dividends. HealthTrust could elect to redeem the Preferred Stock prior to that time, subject to paying a declining redemption premium in excess of the stated liquidation value which did not apply after year 10.

The Common Stock Warrants

In furtherance of the reorganization, Drexel suggested that HealthTrust sell Common Stock Warrants to investors as an inducement to them to acquire HealthTrust subordinated securities. Subsequently, HCA Management agreed that HCAII would receive Common Stock Warrants as part of its equity interest in HealthTrust. Ultimately, HealthTrust issued 19,551,724 Common Stock Warrants as part of the reorganization. HCAII acquired 17,741,379 Common Stock Warrants and institutional investors procured the remaining 1,810,345.

The 17,741,379 Common Stock Warrants that HealthTrust issued to HCAII were each exercisable for one share of HealthTrust Common Stock, beginning on March 1, 1988, for a period of 20 years. In the aggregate those Common Stock Warrants were exercisable for 34.3 percent of HealthTrust's Common Stock, on a fully diluted basis. The exercise price through 1989 was $30 per share. Thereafter, the exercise price was to be reduced annually for the next 6 years until it reached a price of $10 per share. The exercise price was to remain $10 per share through 2008 unless HealthTrust's Common Stock reached specified levels and the ESOP loans were current, in which case the exercise price would be further reduced to $6 per share, starting in 1993.

The Employee Stock Ownership Plan

The Acquisition Agreement required that HealthTrust establish an ESOP for the benefit of its employees. Accordingly, an ESOP was established by HealthTrust and funded with a trust (the ESOP), and Mr. Thomas Neill, Mr. William Gregory, and Mr. Mark Warren, who were employees of HealthTrust, were appointed by HealthTrust to serve on the ESOP administrative committee (ESOP Committee), which operated independent of HealthTrust Management. HealthTrust appointed the First American Trust Co. of Nashville, Tennessee, to serve as trustee (Trustee) for the ESOP. The ESOP Committee retained independent legal counsel and its own investment advisor, Interstate Securities Corp (Interstate).

## Financing The Acquisition

On September 17, 1987, HealthTrust adopted the ESOP and made an initial contribution to it of $30,000. On that same date, the ESOP used the initial contribution together with $809,970,000 it borrowed from HealthTrust to purchase 27 million shares of Common Stock at a purchase price of $30 per share. Of the total shares of Common Stock the ESOP acquired from HealthTrust, 26,999,000 shares were placed in an escrow account to serve as collateral for the loans to the ESOP. The Common Stock would be released from the escrow account to the ESOP as the loans were repaid. On September 17, 1987, HCAII also sold to the ESOP for $30 per share the 1,000 shares of Common Stock that it then owned.

HealthTrust obtained the amount it loaned to the ESOP by borrowing $540 million (ESOP Term Loans) and from the proceeds from HealthTrust's issuance of promissory notes (ESOP Senior Notes) in the aggregate principal amount of $270 million. Interest was payable on the ESOP Term Loans at a fluctuating rate which initially was 8.713 percent. The ESOP Senior Notes bore an interest rate of 11-3/4 percent.

In furtherance of the reorganization, HealthTrust also incurred approximately $392 million of debt under a credit agreement (Credit Agreement) with several banks. It further assumed the obligations of HCAII under Increasing Rate Senior Subordinated Notes (Senior Subordinated Notes) having an

aggregate principal amount of $286 million and Increasing Rate Guaranteed Subordinated Debentures (Guaranteed Debentures) having an aggregate principal amount of $240 million. Additionally, the Subsidiaries assumed the obligations of HCA and certain of its subsidiaries under certain loans having an aggregate principal amount of approximately $7,700,000.

Interest was payable on the loans under the Credit Agreement at a fluctuating rate, which initially was 10.25 percent. Interest was payable on the Senior Subordinated Notes at a fluctuating rate which increased each quarter and initially was 12.063 percent. The Guaranteed Debentures were guaranteed by HCA and interest thereon was payable at a fluctuating rate which increased each quarter and initially was 8.563 percent. In total, HealthTrust borrowed over $1.7 billion in connection with its acquisition of the Subsidiaries' stock.

Pursuant to the reorganization, the ESOP purchased 99.5 percent of the initially outstanding Common Stock for $30 per share, and HealthTrust Management purchased the remaining 0.5 percent also for $30 per share. HealthTrust Management borrowed the funds from HealthTrust to purchase their Common Stock. The loans to HealthTrust Management were for a 10-year period and bore interest at the prime rate of Chase Manhattan Bank, which was payable annually either in cash or by the delivery to HealthTrust of promissory notes, which matured on September 17,

1997.  During December 1988 and January 1989, HealthTrust repurchased for $28.875 per share substantially all of the Common Stock initially purchased by HealthTrust Management.  The purchase price was paid by reducing the amount of the promissory notes.  On January 31, 1989, HealthTrust canceled the remaining indebtedness of HealthTrust Management and paid them additional compensation to cover the taxes on the income resulting from the debt cancellation and the payment of that additional compensation.

The Goldman Sachs Valuation

During 1987, petitioners retained the investment banking firm of Goldman, Sachs & Co. (Goldman Sachs) to provide a fairness opinion as to whether the consideration to be received for the Facilities was fair.  Accordingly, Goldman Sachs evaluated the fair market value of the Securities.  In a report dated February 2, 1988 (Goldman Sachs Valuation), Goldman Sachs concluded that the fair market value of the class A preferred stock was within a range of $152 million to $168 million (midpoint, $160 million), that the fair market value of the class B preferred stock was within a range of $97 million to $108 million (midpoint, $102 million), and that the fair market value of the Common Stock Warrants was within a range of $22 million to $52 million (midpoint, $37 million).  Goldman Sachs stated further that it would not be unreasonable to use the midpoint of

each range of values as a single estimate of the fair market value of the Securities, which in the aggregate totaled $299,500,000.

On the Form 10-Q filed with the SEC for the quarter ended September 30, 1987, petitioners showed an aggregate value for the Securities of $300 million. During January 1988, the SEC questioned whether HCA should have recognized any gain from the sale of the Subsidiaries on that Form 10-Q inasmuch as it appeared to the SEC that petitioners continued to be substantially at risk for the operations of the Subsidiaries because of the Guarantee Agreement and the Make Well Agreement and because of the Securities held by petitioners. Accordingly, petitioners agreed during February 1988 to defer for financial reporting purposes the gain on the sale of the Subsidiaries, and they restated the results of the third quarter 1987 to reflect that deferral.

J.C. Bradford Valuation

During October 1987, HealthTrust retained the investment banking firm of J.C. Bradford & Co. (J.C. Bradford) to value the Securities for accounting and reporting purposes (J.C. Bradford Valuation). J.C. Bradford concluded that as of September 17, 1987, the fair market value of the class A preferred stock was $212 million, the fair market value of the class B preferred stock was $114 million, and the fair market value of the Common

Stock Warrants issued to HCA and certain institutional investors was $117 million, a total of $443 million. Based on the J.C. Bradford Valuation, the 17,741,379 Common Stock Warrants HCA owned (out of the 19,551,724 Common Stock Warrants issued) had a fair market value of approximately $106,166,650. In valuing the class A preferred stock for HealthTrust, J.C. Bradford used an assumed dividend rate of 14.66 percent, which was equal to the 30-year Treasury bond rate of 9.66 percent in effect on September 17, 1987, plus 500 basis points.

For financial reporting purposes, HealthTrust initially used the fair market values for the Securities determined by J.C. Bradford. HealthTrust also employed those fair market values on a registration statement it filed with the SEC on January 19, 1988, in order to register the ESOP Senior Notes, class A preferred stock, class B preferred stock, Common Stock, and Common Stock Warrants. The SEC subsequently asked HealthTrust to explain why HealthTrust reported different values for the Securities from the values stated by petitioners on their Form 10-Q for the quarter ended September 1987. The SEC indicated its belief that the discount rate which had been used by J.C. Bradford should have been higher to reflect the significant risk of HealthTrust's highly leveraged financial position. Accordingly, HealthTrust agreed to reduce the value placed on the Common Stock Warrants from $117 million to $52 million. Based on

that reduction, the Common Stock Warrants issued to HCA would be valued at approximately $47 million. HealthTrust made no change to the fair market value placed on the Preferred Stock. HealthTrust informed the SEC that the values placed on the Preferred Stock by Goldman Sachs and by J.C. Bradford could be reconciled because the Preferred Stock constituted an asset to HCA but was a liability to HealthTrust, and because HealthTrust had to increase ratably the recorded value of that stock over the term of the Preferred Stock until the applicable accounts reflected the $50 per share mandatory redemption value.

For Federal income tax purposes, HealthTrust reflected the values for the Preferred Stock as calculated by J.C. Bradford and the value of the Common Stock Warrants as calculated by J.C. Bradford but adjusted as agreed to with the SEC.

Interstate Valuation

The ESOP Committee retained Interstate to render an opinion on the fairness of the Acquisition to the ESOP (Interstate Valuation). In a report dated September 17, 1987, Interstate stated that it believed that the Acquisition was fair to the ESOP.

Subsequent Public Offering

During December 1991, HealthTrust made a public offering of its Common Stock. Immediately thereafter, pursuant to an agreement between HCAII and HealthTrust entered into during June

1991, HealthTrust issued to HCAII approximately 11 percent of Common Stock upon the exercise by HCAII of a portion of its Common Stock Warrants. HCAII used a portion of its Preferred Stock to pay the Warrant exercise price. Additionally, pursuant to that agreement, HealthTrust redeemed the remaining Securities held by HCAII for $600 million in cash.

Treatment of Sale on HCA Consolidated Returns

On the consolidated returns for tax years ended 1987 and 1988,[4] petitioners reported long-term capital gains from the sale by HCAII of the stock of the Subsidiaries and the sale of the HealthTrust Common Stock in the amount of $292,086,908 and $20,436,509, respectively. In calculating the sales price of the stock of the Subsidiaries, petitioners reported cash received from HealthTrust in the amount of $855,164,281 and bridge loan assumed by HealthTrust in the amount of $729,236,296 (i.e., $777,041,795 bridge loan reported assumed by HealthTrust and the Subsidiaries less $47,805,499 reported assumed by the

---

[4] Because of a lawsuit pending during 1987 relating to one of the Hospitals acquired by HealthTrust, the parties to the Acquisition placed in escrow $26,861,582 of the purchase price, consisting of cash in the amount of $22,888,683 and 129,116 shares of class A preferred stock valued by HCA in the amount of $3,972,899. During 1988, following settlement of that lawsuit, the sale of the Hospital was finalized, and the escrowed funds were released to HCAII.

Subsidiaries),[5] for an aggregate of $1,584,400,577.[6]  HCA also

reduced its basis in the stock of the Subsidiaries to reflect the

assumption by the Subsidiaries of $47,805,499 of the bridge loan

as well as $7,755,539 of HCA debt.  Additionally, HCA reported

the value of the Securities in the aggregate amount of

$299,500,000, based on the midpoint of the range of fair market

values for the Securities suggested by Goldman Sachs.

Notice of Deficiency

On audit, respondent determined that, for purposes of

determining gain from the sale of the stock of the Subsidiaries,

---

[5]     HealthTrust and the Subsidiaries actually assumed
$770,799,282 of the bridge loan.  Accordingly, petitioners
overstated the amount of the bridge loan assumed by HealthTrust
and the Subsidiaries by $6,242,513.

[6]     The parties stipulated this amount.  The Notice of
Deficiency reflects sales prices as corrected for taxable years
ended 1987 and 1988 relating to the sale of stock to HealthTrust
of $2,096,179,540 and $51,359,666, respectively.  Schedules
attached to the Revenue Agent's Report (RAR) for those years show
the computation of those amounts.  The RAR indicates, among other
things, that the total cash and debt assumption consideration
received by HCA for both years was $1,583,928,661, a difference
of $471,916 from the amount stipulated by the parties.  A
schedule in the RAR entitled Reconciliation of Cash Received to
Sales Agreement (reconciliation schedule), which shows the
computation of the cash and debt consideration for taxable year
ended 1987, indicates that $25,000 cash was returned to
HealthTrust.  The reconciliation schedule also shows HCA
obligations assumed by HealthTrust in the amount of $7,763,924,
rather than the $7,755,539 that is reflected in a schedule
supplementing the reconciliation schedule.  The parties do not
address the discrepancies among the amounts stipulated and those
reflected in the RAR, and we are unable to resolve the
discrepancies.  We, therefore, shall accept the amounts
stipulated by the parties.

petitioners had understated the values of the Securities. For the value of the Preferred Stock, respondent used the liquidation value of the class A preferred stock and the class B preferred stock. For the value of the Common Stock Warrants, respondent used the value of the Common Stock Warrants determined by J.C. Bradford and without consideration of the adjustment agreed to between HealthTrust and the SEC. Respondent determined that the values of the Securities were as follows:

| Security | Value |
|---|---|
| Class A preferred stock (5,200,000 @ $50 per share) | $260,000,000 |
| Class B preferred stock (4,000,000 @ $50 per share) | 200,000,000 |
| Common stock warrants (17,741,379 @ $5.98 per warrant) | 106,093,446 |
| Total | 566,093,446 |

Respondent made additional adjustments to the sales price of the stock of the Subsidiaries to reflect misclassified selling expenses as well as adjustments to the basis of that stock.[7] Those adjustments are not at issue in the instant opinion and for simplicity will not be detailed herein. In the aggregate

---

[7] One of the adjustments to basis pertained to the proper treatment of the 10-year spread of a sec. 481(a) adjustment resulting from certain petitioners' changing their methods of accounting from the cash or hybrid methods to an overall accrual method for the tax year ended 1987 to conform to the requirements of sec. 448. We addressed petitioners' challenge to respondent's interpretation of sec. 448(d)(7), which specifies the applicable spread period, in an Opinion issued Sept. 12, 1996. See Hospital Corp. of Am. v. Commissioner, 107 T.C. 73 (1996).

respondent determined net adjustments to the gain (or loss) from the sale of stock of the Subsidiaries for 1987 and 1988 in the amounts of $564,053,714 and ($11,514,100), respectively.

OPINION

Section 1001 governs the determination of gains and losses on the disposition of property. Commissioner v. Tufts, 461 U.S. 300, 304 (1983). Section 1001(a) provides in part that the gain from the sale or other disposition of property shall be the excess of the amount realized over the adjusted basis provided in section 1011 for determining gain. Section 1001(b) provides in part that the "amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

The Reorganization Agreement states that the purchase price for the stock of the Subsidiaries was $2,099,970,000, payable $855,164,281 in cash, $777,041,795 in assumption of the Bridge Loan, $7,763,924 in assumption by the Subsidiaries of debt obligations of HCAII (for a total of $1,639,970,000 in cash and debt assumption), and $460 million in (x) shares of class A preferred stock and class B preferred stock, and (y) Common Stock Warrants. For purposes of determining gain from the sale of the stock of the Subsidiaries, the amount HCAII realized is the sum of the cash HCAII received, the HCA debt HealthTrust assumed, plus the fair market value of the Securities HCAII received from HealthTrust. See Nestle Holdings, Inc. v. Commissioner, 94 T.C.

803, 815 (1990) ("redeemable preferred stock received on a sale or other disposition of property is 'property (other than money)' for purposes of section 1001(b), regardless of the method of accounting used by the taxpayer, and is to be included in the 'amount realized' at its fair market value").

In the notice of deficiency, the respondent calculated the amount HCAII realized from the sale of the stock to HealthTrust as follows:

|  | 1987 | 1988 | Total |
|---|---|---|---|
| Cash and debt | $1,536,541,894 | $47,386,767 | $1,583,928,661 |
| Securities | 559,637,646 | 6,455,800 | 566,093,446 |
| Total | 2,096,179,540 | 53,842,567 | 2,150,022,107 |

For the value of the Preferred Stock, the Commissioner used the liquidation value of the class A preferred stock and the class B preferred stock. For the value of the Common Stock Warrants, the Commissioner used the value of the Common Stock Warrants reached by J.C. Bradford.

Does The Danielson Rule Apply?

Respondent now contends that, pursuant to the rule first articulated in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965) (the so-called Danielson rule), for purposes of determining the amount realized from the sale of stock to HealthTrust petitioners are bound to their agreement that the value of the Acquisition was

$2,099,970,000.  The rule in Danielson v. Commissioner, supra at 775, vacating and remanding 44 T.C. 549 (1965), is that, although the Commissioner is not bound by allocations or characterizations stated in a contract, a taxpayer can disavow the terms of an agreement, in order to challenge the tax consequences flowing therefrom, only by adducing proof showing mistake, undue influence, fraud, duress, or other ground that in an action between the parties to the agreement would be admissible to set aside that agreement or alter its construction.  We have not adopted the Danielson rule.  Coleman v. Commissioner, 87 T.C. 178, 202 and n.17 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987).  We generally apply the less stringent "strong proof" rule.  Id. at 202.  That rule requires the taxpayer, in disavowing the terms of a written instrument in order to challenge the tax consequences flowing therefrom, to present "strong proof", i.e., more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties.  Estate of Durkin v. Commissioner, 99 T.C. 561, 572-573 (1992) (Court reviewed); Elrod v. Commissioner, 87 T.C. 1046, 1066 (1986); G C Servs. Corp. v. Commissioner, 73 T.C. 406, 412 (1979); Stephens v. Commissioner, 60 T.C. 1004, 1012 (1973), affd. without published opinion 506 F.2d 1400 (6th Cir. 1974).  Nonetheless,

the Court of Appeals for the Sixth Circuit, to which an appeal in the instant case would lie absent stipulation of the parties to the contrary, has indicated its acceptance of the Danielson rule. See North American Rayon Corp. v. Commissioner, 12 F.3d 583, 587 (6th Cir. 1993), affg. T.C. Memo. 1992-610; Schatten v. United States, 746 F.2d 319, 321-322 (6th Cir. 1984) (per curiam). Accordingly, if the Danielson rule is applicable in the instant case, we must follow it.  Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

Respondent contends that the Danielson rule requires that the amount realized from the sale of stock of the Subsidiaries must be determined by using the purchase price stated in the Reorganization Agreement, rather than the value of the component parts of the consideration received from HealthTrust as asserted by petitioners.

Petitioners contend that the Danielson rule does not apply in the instant case because the parties made no mutual agreement as to the fair market value of the Securities.  Petitioners argue that the Reorganization Agreement merely referred to the liquidation value of the Preferred Stock in reciting the form of the consideration that HCAII would receive.  Petitioners contend that the fair market value of the Securities was $299,500,000.

In Danielson, the court bound the taxpayer to the terms of
an agreement for the sale of his business that allocated a
specific portion of the sales price to a covenant not to compete.
Commissioner v. Danielson, supra at 778.  Courts, however, have
applied the Danielson rule beyond the confines of allocations of
payments to a covenant not to compete.  E.g., Schatten v. United
States, supra at 321-322 (6th Cir. 1984) (per curiam) (whether
payments from taxpayer's ex-husband were for property settlement
or alimony); Bradley v. United States, 730 F.2d 718, 720 (11th
Cir. 1984) (whether funds received from real property purchaser
were interest income or payments on a continuing option); Spector
v. Commissioner, 641 F.2d 376, 382 (5th Cir. 1981), revg. 71 T.C.
1017 (1979) (whether transaction in which taxpayer surrendered
his partnership interest in an accounting firm was a sale or a
liquidation); Coleman v. Commissioner, supra at 202 (whether the
taxpayers had a depreciable interest in certain computer
equipment involved in computer leasing arrangements).

In refusing to permit the taxpayer to disavow the
allocations specified in the contract, the court in Danielson
stated that the policy considerations for the rule were the
desire to avoid a unilateral reformation of a contract which
could lead to possible unjust enrichment of one of the parties to
the contract; a concern for predictability in allocating the tax

consequences in the sale of a business; and a concern for the administrative burdens and possible whipsaw problems that the Commissioner could face absent the rule. Commissioner v. Danielson, supra at 775. Where those underlying policy considerations were absent, the Court of Appeals for the Third Circuit has found the Danielson rule inapplicable. See Strick Corp. v. United States, 714 F.2d 1194, 1206 (3d Cir. 1983); Amerada Hess Corp. v. Commissioner, 517 F.2d 75, 86 (3d Cir. 1975), revg. White Farm Equip. Co. v. Commissioner, 61 T.C. 189 (1973). Other courts have similarly found the Danielson rule inapplicable where those underlying policy considerations were absent. Comdisco, Inc. v. United States, 756 F.2d 569, 578 (7th Cir. 1985); Harvey Radio Lab., Inc. v. Commissioner, 470 F.2d 118, 120 (1st Cir. 1972), affg. T.C. Memo. 1972-85; Freeport Transp., Inc. v. Commissioner, 63 T.C. 107, 116 (1974).

Petitioners contend that the Reorganization Agreement's mere reference to the stated liquidation value of the Preferred Stock was a recital of the consideration that did not constitute an agreement as to fair market value of the Securities. In support of their contention, petitioners rely on Campbell v. United States, 228 Ct. Cl. 661, 661 F.2d 209 (1981), wherein the Court of Claims held that a contract providing that the shareholders of a corporation would sell their stock for "(a) $21 million in

cash; (b) $6.6 million represented by three unregistered Unitec [the seller's] 6 percent notes payable over 3 years; (c) $4 million represented by unregistered Unitec 6 percent notes * * *; and (d) 100,000 shares of unregistered Unitec common stock" constituted a "bares bones recital as to the amount and form of consideration to be paid" and not "an agreement intending to establish the fair market value for that consideration." Id. at 665, 675, 661 F.2d at 212, 217.  Petitioners argue that, as in Campbell, the Reorganization Agreement contained no agreement as to the fair market value of the Securities but merely recited the form of the consideration HCAII would receive.

Respondent contends, however, that once HCA and HealthTrust reached agreement on the Facilities that HealthTrust would acquire, the Bankers Trust model used asset and cash-flow valuations as well as other factors to establish the purchase price of those Facilities.  Respondent alleges that HCA and HealthTrust agreed that the purchase price determined by the Bankers Trust model would govern the value of the transaction.  Additionally, respondent asserts that the Bankers Trust model determined that the fair market value of the Facilities was $2,099,970,000, and that amount was a fair and reasonable price for the Acquisition.  Respondent contends further that the Amended Agreement merely restructured the financial terms of the Acquisition--it did not change the agreed upon purchase price or the fair market value of the Facilities.  Consequently,

respondent asserts, the value of the transaction, and the value of the component parts of the transaction, remained at $2,099,970,000.

Respondent contends that the parties valued the Securities at $460 million--the difference between (a) the sum of the cash and bank loans and (b) the agreed fair market value of the transaction--because the Reorganization Agreement specified a purchase price of $2,099,970,000. Accordingly, respondent argues, because petitioners have not shown that the Reorganization Agreement would be unenforceable among the parties because of mistake, fraud, duress, undue influence, or similar reasons, petitioners may not now contend that the sale price actually was approximately $1,884,000,000.

Petitioners, however, deny that the Bankers Trust model established the fair market value of the Facilities. They contend that it merely determined the maximum amount of debt load that HealthTrust could carry. Petitioners assert that the $460 million stated in the Reorganization Agreement for the Securities did not represent their fair market value. Rather, petitioners argue, it embodied the amount of equity that HealthTrust needed to reflect in order to obtain financing for the Acquisition. Additionally, petitioners argue that an attempt to construe the terms of the Reorganization Agreement as assigning a $460 million value to the Securities creates ambiguities, including what portion of that $460 million to assign to the class A preferred

stock, to the class B preferred stock, and to the Common Stock Warrants.

As we understand the <u>Danielson</u> rule, it is not applicable where the parties have not established the fair market value of the property at the time agreement is adopted because, under those circumstances, there is no agreement to which a party may be held.  See <u>Campbell v. United States</u>, 228 Ct. Cl. at 675-677, 661 F.2d at 217-218; see also <u>Commissioner v. Danielson</u>, 378 F.2d at 778 ("it would be unfair to assess taxes on the basis of an agreement the taxpayer did not make").  Furthermore, the <u>Danielson</u> rule is not applicable if the contract is ambiguous. See <u>North American Rayon Corp. v. Commissioner</u>, 12 F.3d at 589 ("the <u>Danielson</u> rule does not apply if there is no contract between the parties or if the contract is ambiguous"); see also <u>Patterson v. Commissioner</u>, 810 F.2d 562, 572 (6th Cir. 1987), affg. T.C. Memo. 1985-53.

In the instant case, the Reorganization Agreement does not explicitly state that the value of the Securities was $460 million, or that the value of the stock of the Subsidiaries was $2,099,090,000, or even that the value of the Facilities was $2,099,970,000.  Rather, it states that the $2,099,970,000 purchase price for the Acquisition was

> payable (i) $855,164,281 in cash * * *; (ii)
> $460,000,000 in (x) shares of Class A Preferred Stock
> of Buyer and Class B Preferred Stock of Buyer * * * and
> (y) warrants * * *; (iii) through the assumption of all
> of the obligations of Seller under the Bridge Loan * *

* of $777,041,795; and (iv) through the assumption by the Subsidiaries of all of the obligations of Parent [HCA] * * * of $7,763,924.

Respondent's position that the parties agreed to a fair market value of $460 million for the Securities rests on a number of assumptions. The first assumption is that the Bankers Trust model determined that the fair market value of the Facilities was $2,099,970,000. The second assumption is that the aggregate value of the stock of the Subsidiaries equaled the fair market value of the Facilities--HealthTrust purchased the stock of the Subsidiaries, not the assets they owned. The third assumption is that the parties agreed that the value of the Securities equaled the difference between the sum of the cash HCAII received plus the debt HealthTrust assumed and $2,099,970,000.

The record, however, reveals that there was no agreement among the parties as to the fair market value of the Securities, of the stock of the Subsidiaries, or of the Facilities. To the contrary, the record supports petitioners' contention that the $2,099,970,000 purchase price as originally formulated was "backed into" so that HealthTrust's balance sheet would reflect equity equal to 15 percent of the cash that petitioners expected to derive from the transaction. No HealthTrust Management representative participated in negotiations with the lenders or with HCA Management representatives in determining the terms of the Acquisition. At trial, petitioners presented evidence, uncontroverted by respondent, that no HCA Management

representative responsible for negotiating the terms of the Reorganization Agreement believed that the fair market value of the Securities was $460 million.

Respondent's contention that the fair market value of the Facilities was $2,099,970,000, although facially plausible, is not established. Even if correct, however, it does not necessarily follow that the fair market value of the Facilities was equal to the fair market value of the stock of the Subsidiaries owning those Facilities. Nor does it necessarily follow that the fair market value of the Securities was equal to the liquidation value of the Preferred Stock.

We find no evidence that the parties to the Acquisition agreed that the fair market value of the Securities was $460 million. Indeed, on audit, the respondent took a different position, valuing the Preferred Stock at liquidation value of $50 per share and the Common Stock Warrant at $5.98 per warrant for a total value for the Securities of $566,093,446. Furthermore, for financial and tax reporting purposes, neither petitioners nor HealthTrust adhered to the purported agreed value.

In sum, we think that the cases on which respondent relies are distinguishable from the facts of the instant case. In each of those cases one of the parties to an agreement was challenging a value or characterization agreed upon in the contract. E.g., North American Rayon Corp. v. Commissioner, 12 F.3d 583 (6th Cir. 1993); Sullivan v. United States, 618 F.2d 1001 (3d Cir. 1980);

Amerada Hess Corp. v. Commissioner, 517 F.2d 75 (3d Cir. 1975);

Estate of Rogers v. Commissioner, 445 F.2d 1020 (2d Cir. 1971),

affg. T.C. Memo. 1970-192; Seas Shipping Co. v. Commissioner, 371

F.2d 528 (2d Cir. 1967), affg. T.C. Memo. 1965-240.  In contrast,

in the instant case, no value for the Securities is stated in the

Reorganization Agreement, nor is there any evidence that the

parties assigned a fair market value to those Securities.

Accordingly, we conclude that the Danielson rule is not

applicable in the instant case.[8]

Does Section 1060 Apply to the Reorganization Agreement?

Respondent contends further that, pursuant to section

1060,[9] petitioners and HealthTrust must use $2.1 billion as the

---

[8]     For these same reasons, we find that the strong proof rule
also does not apply.

[9]  Sec. 1060 provides in pertinent part as follows:

    SEC. 1060.   SPECIAL ALLOCATION RULES FOR CERTAIN ASSET
ACQUISITIONS.

        (a) General Rule.--In the case of any applicable asset
    acquisition, for purposes of determining both--

            (1) the transferee's basis in such assets, and
            (2) the gain or loss of the transferor with
        respect to such acquisition,

    the consideration received for such assets shall be
    allocated among such assets acquired in such
    acquisition in the same manner as amounts are allocated
    to assets under section 338(b)(5).

        (b) Information Required To Be Furnished to Secretary.--
    Under regulations, the transferor and transferee in an
    applicable asset acquisition shall, at such times and in
    such manner as may be provided in such regulations, furnish
    to the Secretary the following information:

(continued...)

agreed purchase price.  Respondent argues that section 1060 is

applicable to the Reorganization Agreement and that the

legislative history underlying section 1060 states that taxpayers

must report consistent positions as required by the Danielson

case.  Petitioners contend that the provision in section 1060

that binds parties to allocations of consideration among assets

or to the value of assets set forth in a written agreement does

not apply to the instant case because the parties did not agree

in a written agreement as to the allocation of consideration and

because the Acquisition occurred prior to the October 9, 1990,

---

[9]  (...continued)

> (1) The amount of the consideration received for
> the assets which is allocated to goodwill or going
> concern value.
> (2) Any modification of the amount described in
> paragraph (1).
> (3) Any other information with respect to other
> assets transferred in such acquisition as the Secretary
> deems necessary to carry out the provisions of this
> section.
>
> (c) Applicable Asset Acquisition.--For purposes of this
> section, the term "applicable asset acquisition" means any
> transfer (whether directly or indirectly)--
>
> > (1) of assets which constitute a trade or
> > business, and
> > (2) with respect to which the transferee's basis
> > in such assets is determined wholly by reference to the
> > consideration paid for such assets.
>
> A transfer shall not be treated as failing to be an
> applicable asset acquisition merely because section 1031
> applies to a portion of the assets transferred.

The amendment to sec. 1060(a) made by the Omnibus Budget
Reconciliation Act of 1990 (OBRA 90), Pub. L. 101-508, sec.
11323(a), 104 Stat. 1388-464, is not reflected above inasmuch as
it applies generally to acquisitions after Oct. 9, 1990.  But see
infra note 10.

effective date of the amendment to section 1060(a) upon which
respondent apparently relies.[10]

Because we have found supra at 38-40 that the Reorganization
Agreement does not constitute an agreement among the parties as
to the fair market value of the Securities, we agree with
petitioners that the provision of section 1060 on which
respondent relies does not apply in the instant case.

Is the Interstate Valuation Admissible as an Admission by
Petitioners?

Before we address the substantive issue of the fair market
value of the Securities, it is necessary to address an
evidentiary issue.  At trial, respondent proffered a document,
the "Interstate Valuation", as proof of the fair market value of

_____

[10]  Sec. 1060(a) as amended by OBRA 90, see supra note 9,
effective generally for acquisitions after Oct. 9, 1990, reads as
follows:

> SEC. 1060.  SPECIAL ALLOCATION RULES FOR CERTAIN ASSET
> ACQUISITIONS.
>
>     (a) General Rule.--In the case of any applicable asset
> acquisition, for purposes of determining both--
>
>         (1) the transferee's basis in such assets, and
>         (2) the gain or loss of the transferor with
>     respect to such acquisition,
>
> the consideration received for such assets shall be
> allocated among such assets acquired in such acquisition in
> the same manner as amounts are allocated to assets under
> section 338(b)(5).  If in connection with an applicable
> asset acquisition, the transferee and transferor agree in
> writing as to the allocation of any consideration, or as to
> the fair market value of any of the assets, such agreement
> shall be binding on both the transferee and transferor
> unless the Secretary determines that such allocation (or
> fair market value) is not appropriate.  [Emphasis added.]

the Common Stock.  Petitioners objected to admission of the Interstate Valuation on the basis that it is hearsay. Petitioners also objected on the ground that Rule 143(f) precludes admission of the document because the Interstate Valuation constitutes an opinion of an expert who did not prepare an expert report and who was not present at trial to present testimony and be subjected to cross-examination.

Proceedings in this Court are conducted in accordance with the Federal Rules of Evidence.  Sec. 7453; Rule 143.  Generally, "Hearsay is not admissible" in Federal courts, unless otherwise explicitly provided by the Federal Rules of Evidence.  Fed. R. Evid. 802.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).

Respondent contends that the Interstate Valuation is not hearsay because it constitutes an admission by petitioners. Petitioners counter that the Interstate Valuation does not constitute an admission.

Rule 801(d) of the Federal Rules of Evidence expressly excludes from hearsay, among other things, a statement if

> (2) Admission by party-opponent.  The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship,

or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

The Interstate Valuation was not prepared by petitioners, but by Interstate, an investment banking firm unrelated both to petitioners and to HealthTrust.  The statements contained in the Interstate Valuation, therefore, do not constitute an admission under rule 801(d)(2)(A) of the Federal Rules of Evidence.  A conspiracy is not involved in the instant case; therefore, rule 801(d)(2)(E) of the Federal Rules of Evidence is not implicated.

Statements admitted under rule 801(d)(2)(B), (C), and (D) of the Federal Rules of Evidence are admissible only against parties who have adopted them or who bear the specified relationship to the declarant.  Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F. Supp. 1190, 1238 (E.D. Pa. 1980), affd. in part and revd. in part on other issues sub nom.  In re Japanese Elec. Prods. Antitrust Litig., 723 F.2d 238 (3d Cir. 1983), revd. on another issue 475 U.S. 574 (1986).  As to such issues, the record is devoid of any evidence that HCA adopted as its own the Interstate Valuation or demonstrated a belief that Interstate's value of the Common Stock was accurate.  Consequently, the requirements of rule 801(d)(2)(B) of the Federal Rules of Evidence are not satisfied.  Additionally, the ESOP Committee, not HCA, authorized Interstate to value the HealthTrust Common Stock in the course of preparing a fairness report on the purchase of the Common Stock by the ESOP.  Consequently, the

requirements of rule 801(d)(2)(C) of the Federal Rules of Evidence are not met.

Interstate prepared the appraisal of the Common Stock for the benefit of the ESOP and its Trustee, both of whom were independent of HCA and of HealthTrust. Respondent, however, argues that Interstate served as an agent of HealthTrust or of the ESOP in preparing the Interstate Valuation and, therefore, because HealthTrust was a wholly owned subsidiary at the time the Interstate Valuation was prepared, Interstate served as an agent of HCA. We do not agree.

Even if Interstate were found to be an agent of HealthTrust the parent/subsidiary relationship between HCA and HealthTrust by itself would not provide sufficient basis to make the statements of Interstate an admission by HCA. See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., supra at 1247. We believe that the facts and circumstances present in the instant case do not support a conclusion that the Interstate Valuation constitutes an admission by HCA of the fair market value of the HealthTrust Common Stock.

An agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." 1 Restatement, Agency 2d, sec. 1(1) (1958). In the instant case, there is no evidence that Interstate had a fiduciary duty to HCA or that HCA, HealthTrust,

or the ESOP had the right to control Interstate as to the valuation process or result.

There are cases in which the statements of an expert have been found to be admissions. E.g., Collins v. Wayne Corp., 621 F.2d 777, 781-782 (5th Cir. 1980) (deposition testimony of expert hired to investigate and report on an accident was an admission); Mauldin v. Commissioner, 60 T.C. 749 (1973) (appraisal report prepared by Library of Congress Evaluation Committee at direction of the Librarian of Congress admitted as an admission against Government's interest); Transamerica Corp. v. United States, 15 Cl. Ct. 420, 471-472 (1988), affd. 902 F.2d 1540 (Fed. Cir. 1990). We believe, however, that the facts of those cases are distinguishable from the facts of the instant case because, in the instant case, a valuation report was performed by an independent appraiser who was retained by someone (the ESOP committee) other than the party (HCA) against whom it is being offered. We have found no case, and respondent has cited none, in which the statements contained in a valuation report prepared by an independent appraiser retained by a wholly owned subsidiary have been found to be an admission by the parent.

Moreover, we are not convinced that an independent appraiser can serve as an agent of the client and also faithfully carry out the responsibilities and duties of an appraiser. It seems to us that, if an appraiser was an agent of the client, the appraiser would not be independent because the appraiser would owe an undivided loyalty to the client. The expert appraiser, however,

owes a fiduciary duty to the court and to the public.  Estate of Halas v. Commissioner, 94 T.C. 570, 578 (1990).  An appraiser is barred from presenting facts in a biased manner calculated to be favorable to the client's position.  Id.  Experts who author appraisal and valuation reports, moreover, serve as advisers to the courts.  See Fed. R. Evid. 702; Estate of Williams v. Commissioner, 256 F.2d 217, 219 (9th Cir. 1958), affg. T.C. Memo. 1956-239.  The appraiser's duty to the court exceeds any duty owed the client.  Estate of Halas v. Commissioner, supra.  An independent appraiser, therefore, could not subject himself or herself to the control of the client, as an agent must do, and still fulfill his or her duty to the court and to the public. Accord Kirk v. Raymark Indus., Inc., 61 F.3d 147, 163-164 (3d Cir. 1995) (expert witness generally would not be agent of client because an expert normally would not agree to be subject to the client's control with respect to consultation and testimony); Taylor v. Kohli, 642 N.E. 2d 467, 468-469 (Ill. 1994) (generally, the client can influence but not control an expert's thought processes).  Compare 1 Restatement, supra sec. 14N, comment a (Independent contractor as an agent) with id. comment b (Non-agent independent contractor).  Moreover, we believe that an agent appraiser must have to act as an advocate of the principal's position to fulfill the fiduciary duty an agent owes his or her principal.  Such advocacy, however, is contrary to the duty owed the court and the public in general and precludes the assistance of the expert at trial.  The Tax Court, in fact, has

rejected expert testimony when the methods opined by the expert constituted advocacy.  E.g., <u>Estate of Halas v. Commissioner</u>, <u>supra</u>.

Even if an appraiser can be an agent to the client, the record in the instant case does not establish that Interstate was an agent of HCA.  The ESOP Committee retained Interstate to prepare a fairness assessment of the purchase of the Common Stock by the ESOP from HealthTrust.  There is no evidence that Interstate contracted to act for the benefit of HCA or of HealthTrust or that HCA or HealthTrust had the right to control Interstate in the course of that employment.  The record, moreover, does not show that HCA or HealthTrust exercised any control over the ESOP or the ESOP Committee.  The ESOP was a separate entity formed by HealthTrust for the benefit of HealthTrust's employees.  HealthTrust, furthermore, was a separate and distinct corporation from HCA and the other wholly owned subsidiaries of HCA, and it served a valid business purpose (i.e., to effectuate the divestiture by HCA of the Facilities).  The record does not establish that HealthTrust was a mere sham or dummy corporation or a mere alter ego or instrumentality of HCA or any other subsidiary.  See <u>Standard Adver. Agency, Inc. v. Jackson</u>, 735 S.W. 2d 441 (Tenn. 1987); <u>Electric Power Bd. v. St. Joseph Valley Structural Steel Corp.</u>, 691 S.W.2d 522 (Tenn. 1985); see also <u>Baker v. Hospital Corp. of Am.</u>, 432 So. 2d 1281 (Ala. 1983).  Accordingly, we are not persuaded that Interstate was an agent of HCA, of HealthTrust, or of the ESOP.

Based on the foregoing, we agree with petitioner that the Interstate Valuation does not constitute an admission by petitioners.

Even had we agreed with respondent that the Interstate Valuation constituted an admission, we would not be precluded from reaching a different value from that reached by Interstate. See Mauldin v. Commissioner, 60 T.C. at 760-761 (although appraisal report was admitted as an admission against Government's interest, the Court reached its own opinion as to value of donated property based on the record as a whole); see also Transamerica Corp. v. United States, 15 Cl. Ct. at 471-472 (same). Respondent provided neither the qualifications of the preparer of the Interstate Valuation nor the bases of the opinions expressed therein. No one involved in preparing the Interstate Valuation was made available for cross-examination. Accordingly, we would accord the Interstate Valuation little, if any, weight if we were to admit it. See Pack v. Commissioner, T.C. Memo. 1980-65 n.23; see also Harris v. Commissioner, 46 T.C. 672, 674 (1966); Rowland v. Commissioner, 5 B.T.A. 770, 771-772 (1926); Montgomery Bros. & Co. v. Commissioner, 5 B.T.A. 258, 260 (1926); Kilburn Lincoln Mach. Co. v. Commissioner, 2 B.T.A. 363, 364 (1925).

Respondent further contends that the Interstate Valuation is admissible under the business records exception to the hearsay

rule.  See Fed. R. Evid. 803(6).[11]  At trial, respondent made no attempt to lay the foundation required under rule 803(6) of the Federal Rules of Evidence for the admission of the Interstate Valuation as a business record.  See <u>Waddell v. Commissioner</u>, 841 F.2d 264, 267 (9th Cir. 1988), affg. per curiam 86 T.C. 848 (1986); <u>Forward Communications Corp. v. United States</u>, 221 Ct. Cl. 582, 626-629, 608 F.2d 485, 510-511 (1979).  Accordingly, we find that the Interstate Valuation is not admissible under the business records exception to the hearsay rule.

<u>What Is the Fair Market Value of the Securities?</u>

For Federal income purposes, the fair market value of property is the price that a willing buyer would pay a willing seller for that property, neither one being under any compulsion to buy or sell and both persons having reasonable knowledge of all the relevant facts.  <u>United States v. Cartwright</u>, 411 U.S.

---

[11]  Fed. R. Evid. 803(6) provides as follows:

> (6) <u>Records of regularly conducted activity.</u>  A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.  The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

546, 551 (1973); <u>Amerada Hess Corp. v. Commissioner</u>, 517 F.2d at 83; <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 335 (1989); sec. 20.2031-1(b), Estate Tax Regs.  The buyer and the seller are hypothetical, and their characteristics are not necessarily the same as the personal characteristics of the actual seller or of a particular buyer.  <u>Propstra v. United States</u>, 680 F.2d 1248, 1251-1252 (9th Cir. 1982); <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1005-1006 (5th Cir. 1981); <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 437-438 (1993).

Petitioners contend that for purposes of ascertaining the amount realized from the sale of the stock of the Subsidiaries to HealthTrust the fair market value of the Securities as of September 17, 1987, was $299,500,000.  As an alternative argument to the <u>Danielson</u> rule, respondent contends that the fair market value of the Securities acquired by HCAII as partial consideration for that stock is $432,166,650 as of September 17, 1987 (i.e., the values J.C. Bradford assigned to them).

<u>Expert Testimony</u>

In support of their position, petitioners presented the expert testimony of Charles T. Harris III (Mr. Harris), a partner in Goldman Sachs and the team leader for the Goldman Sachs Valuation.  At trial, respondent presented no expert testimony as to the fair market value of the Securities.[12]  As a substitute,

---

[12]    At trial, respondent sought to subpoena as an expert witness Robert S. Doolittle (Mr. Doolittle), a partner in J.C. Bradford &
(continued...)

respondent proffered the testimony of Howard Lewis (Mr. Lewis), a valuation engineer with the Internal Revenue Service in Atlanta, Georgia, as a rebuttal witness to Mr. Harris.

Procedures Used by Goldman Sachs To Value the Preferred Stock

At trial, Mr. Harris stated that Goldman Sachs had used appropriate procedures in valuing the Securities during 1987 and that the Goldman Sachs Valuation had reached accurate conclusions. Mr. Harris explained that, in preparing the Goldman Sachs Valuation, Goldman Sachs had concluded that it would be unreasonable to value the HealthTrust PIK Preferred Stock solely by reference to the trading prices of existing publicly traded PIK preferred stock because (1) only a limited number of publicly traded PIK preferred stocks existed at the time HealthTrust issued the Preferred Stock; (2) shares of the publicly traded PIK preferred stock were thinly traded; and (3) the issuers of the publicly traded PIK preferred stock were not comparable companies to HealthTrust as none were in the health care industry. Based on recommendations of its traders, Goldman Sachs concluded that a more reliable valuation approach would be to analyze the increment between the market yield on the publicly traded PIK

---

[12] (...continued)
Co., to support the Commissioner's position that the fair market value of the Securities was at least $443 million in total, of which petitioners would own approximately $432 million. Respondent had not retained Mr. Doolittle as an expert witness, and he did not wish to serve in that capacity. As Mr. Doolittle was not being called as a fact witness, we declined to enforce the subpoena that would have required Mr. Doolittle to serve as an involuntary, uncompensated expert witness.

preferred stocks and the market yield on the most junior subordinated debt of the issuers of that preferred stock because the corporate bond market was more active.

Goldman Sachs decided that the market required a yield on PIK preferred stock that was 3 to 4 percentage points higher than the yield required on the most junior subordinated debt of the issuer of the preferred stock. To approximate the yield that an investor would have required to acquire subordinated debt of HealthTrust, Goldman Sachs first estimated that HealthTrust subordinated debt would receive a low single B rating and would have a market yield of 15 percent.[13] Consequently, Goldman Sachs concluded that an investor in HealthTrust PIK preferred stock would have required a yield of 18 to 19 percent.

Goldman Sachs then discounted the scheduled cash flows on the class A preferred stock and class B preferred stock, using the estimated required yield for the PIK Preferred Stock, to determine fair market value of the Preferred Stock as of September 17, 1987. For that purpose, Goldman Sachs assumed that the class A preferred stock would pay dividends at a 14-percent rate (the actual rate for the initial dividend period) and that the class B preferred stock would pay dividends at a 12.5-percent

---

[13]  During June 1988, HealthTrust issued subordinated debt that received credit ratings of B3/CCC+ and that bore a market yield of 15-1/4 percent.

rate.  Goldman Sachs concluded that as of September 17, 1987, the class A preferred stock had a fair market value in the range of $152 million to $168 million, and that the class B preferred stock had a fair market value in the range of $97 million to $108 million.

Procedures Used by Goldman Sachs To Value the Common Stock Warrants

To value the Common Stock Warrants, Goldman Sachs first projected the value that the HealthTrust Common Stock would have after 10 years.  For that purpose, Goldman Sachs applied multiples in the range of 6 to 9 to the projected income of HealthTrust in its 10th year of operation.  Next, Goldman Sachs reduced those computed values by the projected amount of debt and preferred stock, net of estimated available cash, that HealthTrust would have in its tenth year of operation.  Goldman Sachs then discounted by 30 to 40 percent the estimated value of Common Stock in that tenth year to estimate the value of the Common Stock on a fully diluted per-share basis as of September 17, 1987, to be in the range of $1.25 to $3.  Lastly, Goldman Sachs used the Black-Scholes option pricing model[14] to estimate the value of the Common Stock Warrants.  Goldman Sachs concluded

_____

[14]   Mr. Harris stated that the Black-Scholes model was the most widely accepted option pricing model and that for purposes of valuing the Common Stock Warrants the model took into account factors such as the value of the Common Stock, the Common Stock Warrant exercise price, the terms of the Common Stock Warrants, an assumed volatility in the price of the Common Stock, and the level of market interest rates.

that the Common Stock Warrants had a value in the range of $22 million to $52 million.

Respondent's Support of Fair Market Value Estimation

In support of the Commissioner's position, respondent relies on the Interstate Valuation and on a compilation of materials relating to the valuation of the Securities performed by J.C. Bradford (Bradford Materials) assembled by respondent. As explained above, we have sustained petitioners' objection to the admission of the Interstate Valuation.

Petitioners waived their objections to the admission of the Bradford Materials. Consequently, the evidence relating to the valuation prepared by J.C. Bradford has been admitted even though that evidence could have been excluded as hearsay. See Waddell v. Commissioner, 841 F.2d at 267. Petitioners, however, do not concede the accuracy or validity of the statements contained in the Bradford Materials.

Even though admitted into evidence, we are free to accept or reject the valuation amounts developed by J.C. Bradford, as we deem appropriate based on the record. See Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); cf. Transamerica Corp. v. United States, 15 Cl. Ct. at 471-472. No one involved in preparing the Bradford Materials was available at trial for cross-examination. See supra note 12. Accordingly, we accord the Bradford Materials little weight.

Determination of Fair Market Value of the Securities

Petitioners argue that there is no basis upon which the values they determined for the Securities may be disregarded because the conclusions reached by Goldman Sachs have substantial support, and respondent presented no probative evidence to the contrary. Nonetheless, we are not required to adopt the values advanced by Goldman Sachs. Cupler v. Commissioner, 64 T.C. 946, 955-956 (1975). Valuation issues are questions of fact and the trier of fact must consider all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Cupler v. Commissioner, supra at 955. We weigh expert testimony in light of the expert's qualifications as well as all the other credible evidence in the record. Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra. We are not bound by the opinion of any expert witness, and we shall accept or reject that expert testimony when, in our best judgment, based on the record, it is appropriate to do so. Id., and the cases cited therein. While we may choose to accept in its entirety the opinion of one expert, we may also be selective in the use of any portion of that opinion. Id.

We, however, do not reject expert evidence without objective reasons for doing so. Neely v. Commissioner, 85 T.C. 934, 946 (1985). Respondent contends that the Goldman Sachs Valuation contains errors, omissions, and is based on estimates and assumptions not supported by independent evidence or

verification.  Mr. Lewis did not independently value the Securities.  Rather, he essentially expressed his preference for the J.C. Bradford approach over the Goldman Sachs approach in valuing the Securities.  Although Mr. Lewis raised some concerns regarding the Goldman Sachs Valuation, we believe that Mr. Harris successfully countered those concerns.  Consequently, Mr. Lewis's testimony has not persuaded us to disregard the Goldman Sachs valuation in its entirety.

The Securities involved in the instant case are unregistered, newly issued Preferred Stock and Common Stock Warrants of HealthTrust.  As of September 17, 1987, the valuation date, the Securities were not publicly traded, and, therefore, they had no listed market price.  Cf. Amerada Hess Corp. v. Commissioner, 517 F.2d at 83 (fair market value of securities traded on a stock exchange generally is the average exchange price quoted on the valuation date).  There were no sales of the Preferred Stock or of the Common Stock Warrants prior to, or within a reasonable time after, the Valuation Date.  Accordingly, actual sales of the Securities cannot be used to determine fair market value.  Cf. Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979).  We agree in principle with respondent that under similar circumstances using comparable sales of publicly traded securities generally is preferable to the indirect method employed by Goldman Sachs.  See Estate of Hall v. Commissioner, 92 T.C. at 335.  A comparable sales approach, however, is

premised on the existence of comparable transactions. Nonetheless, in the instant case the record does not establish that the pay-in-kind preferred stock issued by a relatively few publicly held corporations, all involved in fields unrelated to the health care industry, that J.C. Bradford and by Goldman Sachs identified were comparable to the pay-in-kind Preferred Stock that HealthTrust issued to HCAII. Under the circumstances, we are not convinced that the comparable sales approach used by J.C. Bradford for valuing the Preferred Stock was more appropriate or that the valuation method utilized by Goldman Sachs was unreasonable. Moreover, we are not convinced that the assumptions used by J.C. Bradford for valuing the Securities were more reasonable than those employed by Goldman Sachs.

Accordingly, we think the conclusions reached by Goldman Sachs are reasonable; i.e., that the fair market value of the class A preferred stock in the aggregate is between $152 million and $168 million, that the fair market value of the class B preferred stock in the aggregate is between $97 million and $108 million, and that the fair market of the Common Stock Warrants in the aggregate is between $22 million and $52 million.

Based on the record as a whole, however, we do not agree that the midpoint of those valuation ranges accurately represents the fair market value of the Securities. Rather, we are convinced that a willing buyer would have paid the high point of the ranges advanced by Goldman Sachs. Although the Acquisition

was a highly leveraged buyout, we believe that other factors mitigated the high risks ordinarily associated with that indebtedness. Most of the Hospitals had been owned and operated by petitioners for several years prior to the Acquisition and, therefore, they had an existing, experienced administrative staff. Moreover, HealthTrust was headed by senior HCA Management personnel who had extensive experience in the health care industry and with HCA. HealthTrust Management, furthermore, essentially began operating the HealthTrust organization during May 1987. Except for the decline in operating results for April and May 1987 (while rumors spread about the pending transaction), the Hospitals' operating performance as a group exceeded the projections used to determine the consideration for the Acquisition.

Additionally, immediately after the Acquisition HealthTrust held a commanding position in the health care industry. After the Acquisition, HealthTrust became the second largest, after HCA, hospital management company in the United States measured by the number of domestic hospitals owned, and the fourth largest, after HCA, Humana, Inc., and American Medical International, Inc., measured by the number of domestic beds owned. The Hospitals were comparatively modern facilities and initially would not require extensive capital expenditures for construction, modernization, or maintenance. A significant

percentage of the Hospitals were the only hospitals in their communities.

Furthermore, although the Securities were not registered on September 17, 1987, HealthTrust was required to file at its expense a registration statement with the SEC as soon as practicable after that date and to use its best efforts to take all actions necessary to permit public resale of the Securities. Both classes of Preferred Stock carried a mandatory redemption feature at a price of $50 per share plus accrued and unpaid dividends.

Based on the foregoing, we conclude that willing buyers could be found for the Securities at the high point of each range advanced by Goldman Sachs. Accordingly, we hold that the fair market value of the class A preferred stock in the aggregate is $168 million, the fair market value of the class B preferred stock in the aggregate is $108 million, and the fair market value of the Common Stock Warrants issued to HCA in the aggregate is $52 million, for an aggregate fair market value of the Securities of $328 million.

To reflect the foregoing,

<u>Appropriate orders</u>

<u>will be issued.</u>